In re SAMUEL VANCE KRAUTHOFF; VANCE SHOUSE MEREDITH, Appellant, v: EDWIN A. KRAUTHOFF, Appellant.

Kansas City Court of Appeals, May 24, 1915.

1. **DIVORCE: Custody of Children: Jurisdiction.** By reason of the separation and divorce of parents, their child becomes a ward of the court in which the decree of divorce is rendered,

Meredith v. Krauthoff.

and jurisdiction to award the custody of such child vests in that court to the exclusion of all others. Such jurisdiction is a continuing one, giving the court power to modify its decree as to the custody of the child from time to time, as circumstances change and new conditions arise to make a modification necessary.

2. ———: ———: ———: **Rights of Parents.** The Act of 1913, Laws of Mo. 1913, page 91, in relation to the custody of children did not create a new rule or principle upon which cases involving the custody of children are to be decided, but merely placed the mother upon the same legal level with the father in respect of her eligibility to be selected as the custodian of her child. The right of neither parent is absolute, nor can it become so by contract or agreement. The custody of a child is in the nature of a trust and is upheld only so long as the duties of that trust are faithfully carried out.

3. ———: ———: ———: ———: **Contracts Relating to Custody.** Parties cannot make a final and absolutely irrevocable contract concerning the custody of their child save in the method pointed out by statute by apprenticeships and deeds of adoption. Nor can the court which renders a decree of divorce make a final and absolute decree as to the custody of the child. It is subject to modification as new circumstances arise from time to time.

4. ———: ———: ———: ———: **Guiding Principles.** In determining who shall have the custody of a child the supreme consideration to be ever kept in mind is the child's welfare. The rights of neither parent should be disregarded, but the welfare of the child is superior to the claims of either parent; even the wishes of the child itself must yield to that.

5. ———: ———: **Evidence.** In cases involving the custody of children, the evidence takes a wide range. No other occasion can call more loudly for judicial vigilance in reaching for the exact truth. The attitude of the parents toward each other, the causes leading to the divorce, their treatment of each other, and the character of the parties are all material and admissible in evidence as bearing upon the question of the fitness of the respective parents to have the custody of their child. This should be considered solely in order to arrive at what is for the good of the child, and not in any way for the purpose of gratifying the wishes of one parent or the other, or with any idea of punishment or of rewarding either parent.

6. ———: ———: **Facts Justifying a Change of Custody: Influencing Child Against Parent.** Any act on the part of one parent which tends, or will tend, to cause the child to lose respect for the other parent or prejudice the mind of the child

against its parent is an abuse of the trust. And where the evidence shows that the influences surrounding a child were such as to lead him to believe without cause that his father was not to be trusted; that he was not respected and had no standing in the community; that the father did not provide for him; that his father's family and relations were undesirable people all of which was without foundation; and that the child was led to imbibe unwholsome views of life; this will be deemed sufficient grounds for changing the custody of the child.

7. ———: ———: ———. The facts in this case considered and analyzed, it is held that, taking the whole cycle of the boy's career into consideration, and that he is now twelve-and-a-half years of age and about to enter upon one of the most critical periods of life and needs a father's advice and direction, and that at this age boys begin to escape their mother's apron strings and the influence and training of his father and the benefits of his father's society are what is best for him now, the custody of the boy should be, and is, awarded to the father under certain conditions.

Appeal from Jackson Circuit Court.—*Hon. A. C. Southern*, Judge.

REVERSED AND REMANDED (*with directions*).

*McCune Harding, Brown & Murphy* for appellant, Vance Shouse Meredith.

*Willard P. Hall* and *Edwin A. Krauthoff* for appellant, Edwin A. Krauthoff.

TRIMBLE, J.—Herein we are asked to exercise our jurisdiction as a court of chancery in the adjudication of an exceedingly difficult, embarassing, and important question—one that affects the most sacred feelings and reaches the profoundest depths of the human heart:—which of two separated parents shall be awarded the custody of their child. It is an unwelcome task fraught with heavy responsibility. In its performance, however careful and sympathetic we may be, we must walk with heavy tread into the very

sanctum sanctorum of parental affection, and, laying
hands upon the jewel there enshrined, make such dis-
position of it as, in our finite wisdom, its best interests
may seem to require. It is a painful duty, from which
every well-regulated mind must shrink since its per-
formance has to do not only with the tender relations
of parent and child, but involves the future course of a
human life, and perhaps may have an influence upon
the destiny of an immortal soul. One thought, how-
ever, affords some slight comfort, and that is that
we are in no way responsible for the causes which have
unhappily brought about the situation with which
we are confronted. We are called upon to act; the
heavy obligation is laid upon us; and we have no
choice but to meet it. Let those whose hearts are
wrong remember this when, in their pain and tears,
they realize the effect of this decree.

The object of this investigation is a boy, Samuel
Vance Krauthoff, born December 18, 1902. He is,
therefore, now nearly twelve-and-a-half years old.

The parents were married December 18, 1901, at
Henderson, Kentucky, where the then young bride re-
sided. Her mother, Mrs. Mary Vance Shouse, at the
age of twenty, had been left a widow with one child,
and the two were living at the home of the bride's
maternal grandmother who was also a widow. At
the time of the marriage above mentioned, Mrs. Shouse
was under forty, and the relations between her and her
daughter appear to have been peculiarly close and inti-
mate. The mother was an almost constant companion
of her daughter and seems to have held a dominant
position and influence in her life even after the latter
reached maturity and on down to the institution of
this proceeding. She took part in the correspondence
between the lovers during their courtship, and, when
the ardent suitor visited the object of his affections,
he saw almost as much of the mother as he did of the
daughter. Immediately after the engagement, the

Meredith v. Krauthoff.

prospective young husband invited the mother to take up her abode with them in their new home which they were about to establish in Kansas City. She accepted, and, in May after the wedding, came to Kansas City to make her home with the young couple and thereafter remained with them throughout the rest of their married life. (The relevancy of all that is here said concerning Mrs. Shouse will hereinafter appear.)

At this time the husband was a member of one of the leading law firms of the city and derived a comfortable and constantly increasing income from the practice of his profession. The wife brought no dowry with her.

After living at the Coates House for a time, the newly wedded pair moved to a rented home from which, in the short space of two years, several moves were made to other quarters until finally they were living in a house for which the husband was paying a rental of $90 per month. A lot was finally purchased at a price of $3600 with the intention of erecting thereon a permanent home. Before anything of this kind was done, however, the wife and her mother found another lot which they thought brought them near to more desirable neighbors, and the result was that the first lot was exchanged for it at an additional outlay of $1350 making the second lot cost $4950. Upon this, in 1908, the husband erected a handsome home, the whole representing an expenditure of something over $20,000, one-half of which was obtained by a mortgage on the property.

The union of these two proved to be unfortunate. The wife and her mother, feeling that they belonged to "a family of aristocrats," thought much of society and of social prominence, and desired to occupy a large place in the social world. The evidence shows that they were much concerned about the social standing of those whom they were called upon to recognize, being afraid they were not of their set or station. The hus-

band, although a courteous and polished gentleman, had never had time for so-called "society" and set small value upon its glittering but ephemeral triumphs. He came from a family that had neither the wealth nor the time, nor the inclination, to shine in the society world. His mother, the wife of an officer in the civil war, was left a widow in 1877, with five children to rear, and with scanty means upon which to do so. She was undoubtedly a remarkable woman of great ability, and possessed many excellent qualities of mind and heart. This is shown not only by the estimate of those who knew her and testified to the strength of her character and goodness, but also in the fact that of the three sons she reared and gave to the Republic, the eldest became one of the leading lawyers, first of Missouri, and then of New York, while another rose from the ranks, without the advantages of West Point, to a Lieutenant-Colonel in the United States Army, and the third, the youngest (the defendant), is a lawyer of reputation and ability. It was, therefore, natural and also inevitable that the members of this family, in their struggles for material, intellectual, and moral success, would have little to do with so-called fashionable society, and set small store by its allurements and distinctions.

This difference in the viewpoint from which the husband and wife looked upon life was an immediate, though doubtless not the final nor the chief, cause of their discord and unhappiness. Before the marriage the wife seems to have entertained some doubts as to whether her future husband had the social position she thought should be required of the man to whom she should be married, and very soon after the husband brought his wife to Kansas City, she declined to visit or have anything to do with his mother or sisters. This involved the question of taking the baby to see them after it became old enough to make such visits. The father would always encounter opposition to his

Meredith v. Krauthoff.

taking the boy to see his grandmother and many times this privilege was denied him. The grandmother was very fond of children and greatly enjoyed the child's visits. At every Yuletide she had a Christmas tree with presents thereon for the boy, and at one Easter, as the boy was on his way in company with his father to see his grandmother, he wanted to get her an Easter plant and the father bought it for him that he might make a present of it to his grandmother. When it was learned at the boy's home that this had been done, the mother announced that he could not go again. Along in 1906 or 1907 the grandmother became feeble and in delicate health, not however from any contagious or infectious disease. To her physician she so frequently expressed grief over the fact that she was not able to see her grandchild and was being ignored in her grandmotherly rights, that her doctor was of the opinion that it aggravated her condition. Thereupon her daughter, an aunt of the boy, called upon the mother and explained the situation and told her that the grandmother was in a critical condition, likely to die at any time, and that she was in a very unhappy state of mind because of the denial of the presence of her grandson, and asked the mother if she and the boy would not come to see the grandmother occasionally. To this the wife replied that she preferred to have the relations continue as they were, that when she married her husband, she didn't marry his family.

Without going into further detail at this time concerning their married life and their relations to each other, it is sufficient to say that receptions and dinners and similar society functions were given at the home, and the husband was urged to join certain clubs as a means of improving his social standing and obtaining social recognition; and the questions of their social life and of recognizing socially the friends of the husband, were matters of acute differences between them though he never objected to the society functions

given at his home. It may be observed here that there is no evidence that the friends or associates of the husband were improper or not of the right quality. So far as the evidence shows they were of excellent character and standing, occupied with their work and the task of upbuilding their community, and taking high rank in the various departments of civic, intellectual, and moral life, but entirely too earnest and busy to spend their time solely and exclusively in the social whirl. Nor should it be thought that the husband was so deeply absorbed in his professional duties as to be neglectful of his fireside. The evidence shows him to be of an exceptionally kind and gentle disposition, loving his home, attentive to its best interests, watchful in ascertaining and liberal in supplying every real or fancied need, devotedly attached to his son and manifesting and showering upon him a veritable wealth of affection from his babyhood to the present time. It also shows that he was deeply in love with his wife, and that that love continued even when he discovered that she did not love him, he hoping and fondly believing that her heart would yet turn to him and be his.

One evening in September, 1909, the husband discovered the wife in her room sobbing bitterly, and, upon inquiring the cause, his wife confessed to him that prior to her marriage she had been engaged to Mr. Meredith, that they had had a quarrel and became estranged during which she had married, but that she had never ceased to love Meredith and loved him at that time, and had never loved her husband. He tried to convince her that she was mistaken, and, in the endeavors to preserve his home and have the companionship of his boy, he appealed to his wife's mother to help him. Instead of doing so the mother sided with her daughter, and both announced they would immediately retain an attorney for the purpose of securing a divorce. For some time matters went along thus, their domestic relations becoming more and more

strained as time went on. The husband appealed to his family physician (a second counsin of his wife), and to his two law partners to assist him in composing the troubled affairs of his household. They acceded to his request and saw the wife and mother but to no avail. When the women learned that the husband had told these men of his wife's confession (and the evidence is he told no others), they told the husband they could no longer live with him as the head of the household since people would cease to respect them if they did. They told him there would have to be a separation and discussed with him the character of settlement he should make for the support of his wife and the boy. The husband, hoping against hope, and still fondly believing that his wife would return to his bosom, and that he would still have the companionship of his boy, agreed to make any arrangement that would be satisfactory to them. It is manifest from the evidence that he took this means of convincing his wife of his love for her, and thought by this method her love for him would sooner or later be called into existence, and that his home and fireside would be eventually restored. Aside from the home (which he had put in her name), and an interest in his law firm, the husband had no other property except a number of life insurance policies. These were brought home and the women went over them and picked out those having a cash surrender value, those policies being preferred as they did not care to rely upon the insured paying the premiums in the future. During these negotiations the wife's mother said to him "of course, if you had any money, you could give her a cash settlement, but as it is, we will have to take the promise to pay sums of money in the future." At that time the husband was paying $500 a month for the maintenance of the home; and it was thought that $150 per month would be needed for the husband's expenses and $350 per month would be the proper amount for

the support of the wife and boy. The absolute title to the house was to be in the wife, the husband to pay all taxes and interest, pay off the encumbrance at the rate of $500 per year and keep the property insured for not less than $15,000. When all the details had been gone over and arranged, the husband made a final appeal to his wife to wipe out the past for the sake of the boy. In answer, she turned to him and said "you have to go." He left on the morning of November 6, 1909, taking with him only some personal clothing and some books.

On the 9th of November, 1909, a formal contract between them was signed, reciting that the parties had agreed, on account of unhappy differences, to live separate and apart for the future. In addition to the arrangements hereinbefore mentioned, the contract provided that "it is the intention of the husband to continue for the wife and child the home in Kansas City now occupied by them." Out of the $350 per month the boy was to be clothed, educated and supported. If the boy died, the monthly allowance was to be reduced to $250, and if the mother married anyone other than the father, all obligation to her should cease and the father should then pay $150 per month for the support of the boy. The contract further provided that the custody of the boy should continue with the mother; that the father should have the right, "at all convenient and proper times and places, to have the child either brought or sent to the father to be with the father for such length of time as may be reasonably proper;" that until the child was fourteen years of age he should be educated in the public schools of Kansas City and thereafter at such institutions of learning as the wife might select and the husband approve, and the time of the child, when not at school, should be spent equally between the parties to the contract. It further recited that the wife was contemplating a trip to the continent of Europe in com-

pany with her mother and the child, and the husband agreed to pay the expenses of the three on that trip and, when notified of their desire to return to Kansas City, to supply the necessary funds for their return; that eight insurance policies on the life of the husband, aggregating $10,126, had been assigned to the wife, all of which were fully paid except one for $1000 the premiums on which he agreed to keep paid; and finally, the husband agreed to increase the insurance on his life in favor of the boy from $5000 to $20,000 and pay the premiums thereon and keep them paid.

At the time this contract was signed the husband had been obliged to remove from his home and was living at a hotel. His aged mother was sick with an incurable disease, and his two sisters were occupied in ministering to her. The boy lacked a month and a few days of being seven years old, and the provision for his custody was the best that could possibly have been made for him at that time. The contract is exceedingly long and cannot be reproduced here; but its whole purpose shows that the father was striving to secure and provide for the welfare and comfort of his wife and boy. The evidence shows also, and without dispute, that at the time the father made this contract (which he drew himself), he was sure that at some time in the future he would regain his wife and home, and that he purposely made the contract liberal in order to bring about that result, and in all that he did he was actuated by his absorbing love for the child.

Two days after the contract was signed, to-wit, on November 11, 1909, the wife filed suit for divorce, alleging that "the defendant has offered such indignities to her as to render her condition intolerable" but no indignities were specified or set out, nor was any mention made of the child. On the same day, the defendant, through his counsel, entered his appearance and filed answer admitting the marriage, denying all other allegations, and calling attention to the existence

of the boy. When the case came to trial, the defendant appeared by counsel but made no contest. The evidence taken at the trial was preserved and was introduced at the hearing of this controversy. There were no indignities testified to at the divorce trial. The only evidence submitted was that it was not possible for the wife to live longer in the same house with her husband and that they could not get along. One witness, of the three who testified, said "these two people, from the very beginning, have seemed to have a different point of view for everything. They were raised under different circumstances." After two witnesses had testified, the wife, was put upon the stand and was asked whether, having heard what the two witnesses had said, she "agreed to that view speaking generally of the situation?" To which she replied "yes." She was asked as to the age of her son, and then these questions were propounded and her answers given:

"Q. And you propose to take and keep him, and you are perfectly willing that the decree in this case may provide that the court, if you and your husband differ as to the conduct of the child, may at any time settle the differences between you? A. Perfectly.

Q. At present you should have care of the child? A. Yes, sir; I think I can take better care of him.

Q. During his tender years? A. Yes, sir.

By the court: You say it is impossible for you to live together? A. Yes, it is impossible."

On this evidence a divorce was granted, the decree reciting that "the court does assume and retain jurisdiction of the child, for the purpose hereafter of making such orders with respect to the care and custody of said child as may from time to time be right and proper."

The evidence shows that on the day the decree of divorce was rendered, a Baedecker of Paris was bought and charged to the defendant and that he afterward paid for it upon presentation of the account.

Pursuant to the contract, the money for the European trip therein called for was promptly paid, and the former wife, with her mother and the boy, left for Paris, France. Before they left, and within forty-eight hours after the divorce, the former wife requested her ex-husband to care for her horse in her absence. This horse had been purchased for her by her husband, and it had at one time formerly belonged to Mr. Meredith. Before their departure, the defendant called upon his former wife and, showing her a letter he had received from her aunt in Kentucky expressing horror and regret at the turn matters had taken, told her that at any time she said the word the past would be forgotten and all would be wiped out. The appeal was of no avail.

The party left Kansas City for Europe, November 17, 1909. During their stay abroad the defendant regularly sent the monthly allowance, besides other sums for the boy, and papers and books for his amusement and the perusal of all. They did not return to America until the following spring. Upon their return, they stopped in New York, and at one or two fashionable summer resorts in New Jersey, then came on to Henderson, Kentucky, and finally arrived in Kansas City in July, 1910. On the 4th of August following, the boy's mother married Mr. Meredith. They, with the boy and his grandmother, Mrs. Shouse, went to live in the luxurious home hereinbefore mentioned which the defendant had built for the family that was then his own.

The $350 allowance was regularly paid on the first of each month up to and including August 1, 1910, the defendant not knowing, at that time, of the impending marriage to Mr. Meredith. He was told of the marriage by his boy; and shortly thereafter, the defendant's health failed, he suffering a profound nervous breakdown. So serious did it become, that

191M.A.11

his physician and his law partner advised him to take a sea voyage and trip to Europe and remain there until his health was restored. Arrangements were made whereby the defendant's law firm was to pay the $150 per month for the boy's support, the $350 allowance having ceased after the remarriage of the mother. This allowance of $150 per month was regularly paid from October, 1910, up until either January or May, 1911, when, the senior member of the father's law firm thinking that $150 was an unnecessarily large sum for the monthly requirements of a young boy in view of the father's continued illness, reduced the allowance to $50 per month. (Afterwards, the father restored it to $150 per month, beginning with November 1, 1913.)

In August, 1911, the father returned to Kansas City, but as his health was still poor, he went to San Francisco to visit his army brother stationed there. While in California he was restored to health, and returned to Kansas City in excellent physical condition, and immediately resumed the active practice of his profession and has continued therein ever since with no abatement or diminution of his strength.

On the 24th of September, 1913, the father was married to Miss Daisy Lovering of San Francisco.

For some time before this marriage, various difficult and annoying restrictions had been thrown about the opportunities of the defendant for seeing his boy and upon the visits of the latter to his father. Immediately following the father's remarriage, the privilege of having his boy visit him was at once forbidden. Upon notice being given that the father would apply to the court granting the divorce for an order enforcing his rights, the visits of the boy were again permitted, but under annoying restrictions and limitations, and of such a character as to embarrass the father and son in their relations toward one another and to seriously interfere with the father's influence over the

boy and the latter's filial affection and esteem for his father. Observing this and also that his son was beginning to have erroneous ideas concerning the character and reputation of his father and to entertain what appeared to be unwholesome views of life, the father, on February 17, 1914, filed an application in the court wherein the divorce was granted, reciting the fact of the divorce, the subsequent remarriage of the mother, and the reservation of jurisdiction in the decree concerning the custody of the child, and alleging that "a question has arisen between the parties hereto as to the care and custody of said child, and the parties are unable to agree with regard thereto" and closed with a prayer "that the court may hear testimony regarding said question and make such orders touching the care and custody of said child as may be for his best interests and welfare."

Thereupon, the parties appeared, and the father offered a vast amount of evidence upon the subject. The mother was represented by counsel and the witnesses were carefully cross-examined; but she introduced no evidence in her behalf except that on suggestion of her counsel and with the defendant's consent, the trial judge examined the boy privately in his chambers but not upon oath, which examination was taken down by the stenographer, reduced to writing and, by agreement, made a part of the record.

After hearing and considering a mass of evidence (which in the abstract of record covers over 500 closely printed pages in small type), the court, on June 4, 1914, rendered its decree which, after reciting the facts concerning the former decree of divorce, the subsequent remarriage of the mother, and that both plaintiff and defendant appeared in person and by counsel, declared that "it appearing to the court that said Samuel Vance Krauthoff will be twelve years of age on December 18, 1914, and that he is in good health; and it appearing to the court that said boy

has been, ever since the divorce and is now, in the custody of his mother, the plaintiff; and after full and careful consideration of all the evidence in the case, the court does find that at the present time and under existing circumstances, it is to the best interest of the boy, Samuel Vance Krauthoff, that he be placed in the custody of his father, the above-named defendant.'' It was thereupon decreed that from and after June 11, 1914, the boy be in the custody of his father, and that both plaintiff and defendant appear in court on September 1, 1914, for a further consideration of all the facts in evidence and which might thereafter arise affecting the welfare of the child, and for such further order as the court might deem right in the premises, the court reserving full jurisdiction to make such further orders touching the custody of the boy as may seem to be for his best interests from time to time, in doing which, the court was to have power to consider evidence introduced on this hearing and such other evidence as it should deem fit and proper.

On September 14, 1914, the father, as directed in the decree, appeared in court, and it was announced that the boy was within the jurisdiction of the court, and, at the request of his mother, had been sent to her home upon his arrival in Kansas City that morning. Some question then arose as to the nature of the investigation to be made or steps to be taken at this time, and as to who had the burden of proof. The boy had grown considerably during the summer and was in fine physical condition. The court remarked that there had been an order of absolute custody made in the case; that if no further showing was made the order would stand as it was, or would probably be renewed, and that the burden was on the plaintiff. Whereupon her counsel announced that they wanted to know what had been done with the boy during the summer. Thereupon the defendant offered testimony to show that the boy had been sent for the summer to a school for boys

on the Hudson river in New York; and as the plaintiff had raised some question as to the nature and character of his surroundings since the decree of June 4th, this matter was thoroughly gone into. Upon this feature of the case, testimony *pro* and *con* was introduced sufficient in extent to swell the record to an aggregate of 1173 pages of solid print in small type.

At the conclusion of this hearing, the court, after considering the evidence offered at both hearings, entered an order that "The custody of Samuel Vance Krauthoff is hereby awarded to his father, Edwin A. Krauthoff, upon the following conditions:" These conditions were that the boy should be allowed to visit his mother every week at her residence, and be under her direction, from five o'clock p. m. Friday till five p. m. Sunday, except that on the first Sunday in each month he was to return to his father's house at noon Sunday; that he be permitted to visit his mother during all of the Christmas Holidays; and that he be permitted to visit his mother and be under her direction from June 10 until the first of August of each year. The order closed with the words: "This order contemplates that the residence of the parties hereto shall remain in the jurisdiction of this court." From the decree, as thus modified, both the father and the mother have appealed; and thus the burden of solving a most delicate, perplexing and difficult question is laid upon this court, namely: What is for the best interests of this very intelligent, well developed and promising American boy?

By reason of the separation and divorce of the parents, the child became a ward of the court in which the decree of divorce was rendered. [Sec. 2370, R. S. 1909.] And jurisdiction to award the custody of such child vested in that court to the exclusion of all others. [In re Gladys Morgan, 117 Mo. 249.] Such jurisdiction is a continuing one, giving the court power to modify its decree as to the custody of the child, from

time to time, as circumstances change and new facts and conditions subsequently arise to make a modification necessary. [Phipps v. Phipps, 168 Mo. App. 697, l. c. 700; In re Kohl, 82 Mo. App. 442; Shannon v. Shannon, 97 Mo. App. 119.]

In 1913, the Legislature of Missouri passed "An Act to give married women equal rights with their husbands to the custody of the persons of their minor children." [Laws of Mo. 1913, page 91.]  The first section of that act made the husband and wife, while living together, joint guardians of their minor children "with equal powers, rights and duties."  By section 5 it was provided that the husband and wife, living apart, "are entitled to an adjudication of the circuit court as to their powers, rights and duties" in respect of the custody of their unmarried minor children, "without any preference as between the said husband and wife, and neither the husband nor the wife has any right paramount to that of the other in respect of the custody of such children."  Section 6 provided that in all proceedings involving the custody and control of such children, "the rights of the parents shall be equal, and neither parent as such shall have any right paramount to that of the other parent, but in each case the court shall decide only as the best interests of the child itself may seem to require."  Aside from giving the mother, as a married woman, the right to act as guardian for her child, and removing the common law preference of the father in the matter of its custody, thereby putting the two parents on an equality in that respect, it is not seen that the statute makes any change in the existing law.  The case of People ex rel. v. Elder, 90 N. Y. Supp. 703, was a contest between parents for the custody of their child eleven years old.  There was a statute in that state much like ours above mentioned.  Prior to the divorce the father had made a contract with the mother giving the custody of the boy to her.  After the divorce he took possession of

the boy.  About the only effect the statute seemed to have had in the case is shown in the remark that "under the statute the mother and father are now equal in their rights of guardianship over their children and therefore the mother is not confronted as heretofore with the common law preference for the father."  The evidence showed that the father had practically banished his wife from her home and suggested that she get a divorce.  The court awarded the custody of the child to the mother, not on the strength of the contract, but because she was rearing the child properly and because the father, although not unfit personally to have the child, was not so situated as to be able to look after it carefully.  While, in many cases, it is said that under the common law the father has the paramount right to the child's custody, yet this does not mean an absolute or supreme right.  The preference was given to the father, but if for any reason the welfare of the child called for a different disposition, the courts awarded the custody to the mother, or even to third persons, if circumstances required it.  [In re Blackburn, 41 Mo. App. 622, 1. c. 628.]  In such cases, the question of custody was determined "not on the naked question of right of custody in either parent, but invariably on the determination of the question which our courts hold to be paramount to all others, namely, the welfare of the child itself."  [Brewer v. Carey, 148 Mo. App. 191, 1. c. 207; In re Berenice Scarritt, 76 Mo. 565; Brennaman v. Hildebrandt, 137 Mo. App. 82.]  Hence, the Act of 1913 did not create a new rule or principle upon which such cases are to be decided, but merely placed the mother upon the same legal level with the father in respect of her eligibility to be selected as the custodian of her child.  But the right of neither parent is absolute, nor can it become so by contract or agreement.  That right cannot be acquired in ways analogous to those in which property rights are obtained.  The custody of a child is rather

in the nature of a trust reposed in the parent. It is a qualified right given for the discharge of important trusts, and is upheld and secured only so long as the duties of that trust are faithfully carried out. [Purinton v. Jamrock, 195 Mass. 196, l. c. 201; In re Moore, 11 Irish Common Law Reports 1; Hochheimer on the Custody of Infants (2 Ed.), 24.] For this reason the solution of the question presented in the case at bar is not to be controlled or determined by the contract entered into before the divorce no matter what construction may be placed upon it, or what effect the provision of the decree of divorce, subsequently entered between the parties, had upon it. It is not seen how the language of the contract in the case at bar can be construed as irrevocably giving the custody of the child to the mother, though it does seem to contemplate that the custody which is then confided to the mother may continue till the child reaches the age of fourteen. But as said before, the evident purpose of the contract, at the time it was made, was to safeguard the welfare of the boy, with the hope that, in time the family would be reunited and he would then have the benefit of the joint care and protection of his parents. In addition to this, the divorce decree rendered two days later between the parties to this contract, the terms of which decree the mother clearly understood and consented to before it was entered, expressly made the custody of the child a continuing, temporary, and not a final, matter. In fact, the parties could not have made a final and absolutely irrevocable contract concerning the custody of their child if they had intended to do so, nor indeed could the court have rendered such a decree. [In re Scarritt, 76 Mo. 565, l. c. 582; In re Blackburn, 41 Mo. App. 622, l. c. 630; Swift v. Swift, 34 Beav. 266; Johnson v. Terry, 34 Conn. 259; Waldron v. Waldron, 1 Johns 27; People v. Mercein, 38 Am. Dec. 644; Kuhn v. Breen, 101 Iowa, 665; Carpenter v. Carpenter, 149 Mich. 138; Child v.

Dodd, 51 Ind. 484; Pierce v. Pierce, 30 Mont. 269; Legate v. Legate, 78 Tex. 248; Cook v. Cook, 1 Barb. Ch. 639; Chapsky v. Wood, 26 Kan. 650, l. c. 653; Wilson v. Mitchell, 111 Pac. 21; 29 Cyc. 1604, 1605; Dix v. Martin, 171 Mo. App. 266, l. c. 273; Ex parte Ingenbohs, 173 Mo. App. 261, l. c. 272.] But, as stated, the parties did not attempt to do this, and the decree expressly reserved jurisdiction "for the purpose hereafter of making such orders with respect to the care and custody of said child as may from time to time be right and proper." Consequently, in deciding this case we are not bound by any mere legal or contractual rights of either parent. So far as the law is concerned the mother and father stand upon an equal footing. The fact that the custody of the child was given to the mother is, of course, a circumstance to be considered and weighed along with the evidence bearing upon what shall be done with the child at the present time. The fact that the father gave his child into the custody of the mother and that it has been with her during the past years cannot control the matter. These facts enter into the consideration thereof, of course, and should cause us to be all the more careful and be more certainly convinced of the necessity of a change, and of the correctness of our course, if the situation heretofore existing is to be disturbed. In considering such facts, however, we must bear in mind the situation of the parties at that time, the tender age of the child, the fact that the mother was provided with a home while the father had none, and that the arrangement was made with the hope on the part of the father that his home and his boy would ultimately be restored to him. It was a good arrangement at that time; the best that could have been made under the circumstances. The question, however, now is, shall that arrangement continue in view of the circumstances that afterward arose and are now existing?

In answering this question we must bear in mind that the welfare of the child is the supreme consideration to be ever kept in mind. [In re Blackburn, 41 Mo. App. 622; In re Scarritt, 76 Mo. 565; McKim v. McKim, 12 R. I. 462; Wilson v. Mitchell, 111 Pac. 21; D'Alton v. D'Alton, 4 Prob. Div. 87, l. c. 91; Corrie v. Corrie, 42 Michigan, 509.] While the rights of neither parent should be disregarded or overlooked, yet the welfare of the child is superior to the claims of either parent. [English v. English, 32 N. J. Eq. 738, l. c. 743.] To that welfare "the claim and personal desires of the parents and even the wishes of the child must yield, especially if such desires or wishes are opposed to that object." [Kune v. Miller, 40 Wash. 125, l. c. 128; 14 Cyc. 805; 9 Am. & Eng. Ency. of Law (2 Ed.), 867, 868; Umlauf v. Umlauf, 128 Ill. 378.]

In cases of this character, the evidence necessarily takes a wide range. [McKimzie v. State ex rel., 80 Ind. 547; Berkshire v. Caley, 157 Ind. 1, l. c. 10.] "No other occasion can call more loudly for judicial vigilance in reaching for the exact truth." [Corrie v. Corrie, 42 Mich. 509.] And in determining where the custody of a child shall go, the acts and attitude of the parents toward each other, the causes leading to the divorce, their treatment of each other, and similar matters, are all material, and admissible in evidence as bearing upon the question of the fitness of the respective parents to have the custody of their child. [In re Pray, 60 How. Pr. 194; Wilson v. Elliott, 73 S. W. 946; Welch v. Welch, 33 Wis. 534, l. c. 542; Beene v. Beene, 64 Ark. 518; Hill v. Hill, 82 N. E. (Mass.), 690, l. c. 691; Wilson v. Mitchell, 111 Pac. 21, l. c. 27; Farrar v. Farrar, 39 N. W. 226; Williams v. Crosby, 118 Ga. 296, l. c. 297-8; Hunt v. Hunt, 4 Greene (Iowa), 216, l. c. 222; Miner v. Miner, 11 Ill. 43; People ex rel. v. Brooks, 35 Barb. (N. Y.) 85, l. c. 93; Simmons v. Simmons, 134 Pac. 791, l. c. 794.] It may per-

haps be well to observe here that this evidence should be considered solely in order to arrive at what is for the good of the child, and not in any way for the purpose of gratifying the mere feelings and wishes of one parent or the other, or with any idea of punishment or rewarding either parent. [Hochheimer on the Custody of Infants (2 Ed.), 94.] The fitness of the respective parties, their adaptability to the task of caring for the child, their ability to control and direct it, the age, sex, health, and surroundings of the child, and the influences likely to be exerted upon it, are all to be considered. [Hochheimer, 93.]

Going now to the character of the parties to this sad controversy, it appears from the evidence of many witnesses of high standing, and of unquestioned ability to form just estimates of human character and attainments, that the father's standing and reputation is of the best. He is shown to be a high minded, honorable, sincere man; a good lawyer and citizen; kind and charitable, broad minded, even tempered and generous. His love for children is marked, and his devotion to his child has been already stated. His professional income is shown to be in the neighborhood of $11,000 per year. He is forty-six years of age and in good health. His present wife, Mrs. Daisy Lovering Krauthoff, is shown to be a woman of lovely character, of unusual poise and mental capacity, a sweet and gracious woman, patient, kind and charitable in her nature and a lover of children, with considerable ability in the matter of securing their obedience, confidence and esteem. In the years prior to her marriage, she helped to educate her delicate younger brother, and had, to a large extent, the rearing and education of an orphan neice. She is in perfect sympathy and accord with her husband in his desire to obtain the custody of, and to give a home to, his boy.

The fact that the court is asked to award the custody of the child to the father renders it necessary

to make the foregoing statement as to the character and disposition of the two above-mentioned persons. And this, in turn, calls for a statement concerning the mother of the boy, lest silence upon that subject might give rise to an unwarranted and unfavorable inference in that regard. No attack is made or accusation brought against her moral character.     The disclosure to her first husband of the fact of her prior engagement to and love for another, carried with it no taint or suspicion of anything unlawful or immoral.    The defendant has always regarded, and in this case has treated, that unhappy episode as the mistake of a young girl in marrying one man when she loved another.    And several of defendant's witnesses testified on cross-examination that they knew nothing against her character as a good woman:   In justice to Mr. Meredith it should also be said that the record discloses no treatment of the boy that was unkind or improper on his part.

The father, however, does charge that the persons, in whose care the boy has been heretofore, have unwholesome views of life so that his son is beginning to manifest and reflect tendencies of an undesirable nature; that he has been surrounded by those who, to say the least, did not feel kindly toward the father and prejudiced the boy against his father without cause; that the boy has been taught and caused to believe that no one respected his father, that his father's family was one to be ashamed of; that the son has not been allowed to freely visit or associate with him or his relatives, and when this was permitted it was under such limitations and conditions as to necessarily interfere with their relations and hinder the growth of love and confidence on the part of the son towards the father.

We very greatly regret the necessity of saying so, but a perusal of the testimony in this voluminous record, a portion of which is in the shape of correspondence from those nearest the boy and having great

influence over him, compels us to say that these charges have been undoubtedly established. We need not be so uncharitable as to say these results arose through malice or vindictive feelings on the part of the mother toward the father. So far as the mother herself is concerned, they seem rather to have been brought about by certain views of life and of things in general, by a lack of regard and care for the rights, hopes and aspirations of the father with respect to his child, and by a failure to realize the duty of instilling into the mind of the child a feeling of love, confidence and respect toward its father. Nevertheless, the fact remains that, consciously or unconsciously, she has permitted the unfortunate conditions hereinabove mentioned to exist and flourish.

A regard for the feelings of all concerned, as well as the length of this opinion, prompt us to avoid any minute and detailed analysis of the facts upon which the above conclusion is reached. The importance of the matter, however, imperatively calls for the statement, in general terms at least, of a few of the grounds therefor.

There is no dispute over, or contradiction of, the *facts* offered as the basis of the father's complaint. They stand unimpeached in the record and no attempt was made to refute them.

The father's love and solicitude for the boy is undoubtedly great. Ever since he was born, the father has evinced a deep and abiding affection for his son. During his baby days and early childhood the father's care and fondness for the companionship of his son was so marked as to attract the attention of the neighbors. The boy's affection for him was also marked. When he was two-and-a-half years old, his mother and Mrs. Shouse took him on a trip to Europe leaving the father behind, and the grandmother's correspondence shows the child's love for the father and the desire of the child to get back to see him. After the parents

separated, and upon the return of the women with the child from their second trip to Europe, the boy still loved his father and cried when he was refused permission to go to see him.

Before their return from this second trip, the father was notified in writing that although he could have the boy with him for a time during the coming summer, yet it could only be while the father was away from Kansas City on his vacation; he could not have him in Kansas City; whenever he was in the city, the boy must be at his mother's home.

After the women's return from the second European trip in July, 1910, the evidence shows the father was unnecessarily and unreasonably restricted in his relations with the boy. He was not allowed to take the boy with him where he would come into the company of his friends and acquaintances, and, except upon one occasion, he was not allowed to keep the child over night although at this time he was almost eight years old. As an example of the annoying limitations thrown around the opportunities of the father to see his boy, the father, upon one occasion, had gone to dine at the home of one of the most prominent and reputable physicians in the city (the family physician hereinbefore mentioned, and a kinsman of the boy's mother), and had sent for his boy to come and visit him there. The evidence is that the boy was not allowed to go because the physician's wife "wasn't in society." When the father learned that the boy could not come, he immediately went to the place where he was living and again sent the servant for the boy to come to him there and he was allowed to go. Being thus prevented from taking his boy with him to call upon friends and neighbors, and the father having no other children for the boy to play with, the father was practically limited to taking his boy to the parks and picture shows in order to amuse him.

As hereinbefore stated, in the fall of 1910, the father became ill and was compelled to take a trip to Europe. His illness continuing, his senior law partner reduced the monthly payments for the boy's support from $150 to $50. These payments were always made by depositing them in the bank to the mother's credit. They had never been made to the boy. Consequently, she was the only one who had need or occasion to know of the reduction. From this time forth, the dominant and most potent influence over the boy in the Meredith household (his maternal grandmother, who seems to have always assumed charge of him), began to exhibit the most marked and open hostility and contempt for the father. And from this time the child began to manifest a lack of confidence in and respect for his father. No good would be subserved by setting out the letters and the various acts disclosing this unhappy situation. They show beyond question that the father was regarded merely in the light of a source of supply of money for the boy a portion of which, was desired for him that he might spend summer vacations at fashionable resorts in the east. Once a communication was addressed to the father in March saying $350 would be required for his summer trip, and that, as soon as the money was received, the trip would be arranged. Afterwards the boy asked his father about his coming vacation and the father promised that when the time came the money therefor would be forthcoming. The answer of the child shows that he entertained a conviction, obtained from his mother, that they could not be sure about the vacation until the money was actually in hand and that it was safer that it be obtained some time in advance. Upon one occasion after the father had been restored to health, he asked for a statement concerning the expenditures made for the boy and received in reply a few general items conveying no information whatever, with a curt admonition accom-

panying it to "consult your contract. You certainly have in no way respected it."

The evidence in other particulars shows that the influences surrounding the boy led him to believe that he had a father whose word was not to be trusted; that the father was not respected and had no standing in the community; that he had failed to provide for his child, and that even the home in which the child lived did not come from him. There is also evidence that the boy was told that on account of a lack of money he was compelled to go to the public school, and the child was imbued with the idea, at that time, that only "toughs and poor boys" went there; that the boy also became imbued with the idea that his father's family and relatives were undesirable people; that the father, instead of using his money for the support of his child, had used it in buying a home for his sisters which was not true. While the father was ill in Europe, he communicated with his senior law partner and requested him to send some presents to the boy at the home of the boy's mother. His partner did so, and when the presents were presented at the door with the announcement to the boy that they were from his father, the grandmother called from the top of the stairs "It is a lie," and told the little boy not to believe. his father had sent them, that he didn't think that much of him. Shortly after this, one of the servants in the house was talking to the little boy and telling him what nice presents his father, Mr. Krauthoff, had sent him; and she was thereafter forbidden by the mother to speak to the boy about Mr. Krauthoff or his relationship to him.

On September 20, 1913, the father told his son he was going to marry Miss Lovering of San Francisco. The boy manifested no opposition to the marriage, and as the father was about to leave for California for the wedding, he asked him if he would not like to write a little note of congratulations and good

wishes so that it would be received on the wedding day.
The boy said he would, and thereupon the father gave
him an addressed and stamped envelope in which to
send the letter.   The boy took the envelope home to
write the note, but when the envelope reached San
Francisco it contained no letter from the boy but in-
stead an insulting and abusive communication from the
boy's grandmother.

Upon the return of the father with his bride to
Kansas City, he called the boy's home over the tele-
phone for the purpose of requesting that the boy be
permitted to come to see him.   His request was per-
emptorily refused, the refusal being accompanied with
a disparaging remark concerning the lady he had mar-
ried.   When it was learned that the father was going
to ask the court for permission to see his boy, the
refusal was modified to the extent that the boy could
visit his father *but only at his law office* on any day
of the week except Saturday or Sunday and not in
the presence of the new Mrs. Krauthoff.   This was
practically a denial of the father's right to the society
of his boy, and was not acceptable to the father, who,
upon inquiring the reason for such a restriction, was
told it was not on account of any objection to his wife,
but because Mrs. Meredith didn't want the father to
see the boy in the presence of any woman who was
married to the father and was not the boy's mother,
this notwithstanding the fact that the boy for years
had been in a home where the husband was not his
father.   Upon the father declining to submit to any
such restrictions, the mother agreed to let the boy visit
his father any Sunday convenient for her to let him
go if the father would arrange to send a taxicab for
him.   The father was unwilling that his boy should
form the taxicab habit and was of the opinion that he
was old enough to ride on the street cars instead of
using such an expensive mode of conveyance.   There-

191M.A.12

after, the boy was allowed to go to see his father, but was required to return at unreasonably early hours in the afternoon. In the course of these visits the defendant discovered the conception the boy had of his father, and the results of the influences with which he had been surrounded. He therefore filed the application which is the foundation of this controversy.

In the case of In re Taylor, 59 Eng. Rep. 846, it is said that ''to have a child grow up without filial respect for its parent will have the worst possible effect upon the mind of the child.'' In Carpenter v. Carpenter, 149 Mich. 138, it is held that any act on the part of the mother which tends, or will tend, to cause the child to lose respect for its father will be deemed sufficient cause to transfer the custody of the child to the father. In English v. English, 32 N. J. Eq. 738, l. c. 748-9, it is said that if any influence is exerted over the child by its mother, or by those about it, to prejudice the child's mind against the father, it is an abuse of the trust. ''One of the objects of the law is to foster and encourage mutual affection between parent and child. An important purpose of education is to train children to the cultivation of affection and obedience. If it appears otherwise, or if she (the mother) permits those in whose society the child is thrown, by act or word, to alienate his affection from his father, she has abused her trust.'' In Sherwood v. Sherwood, 56 Iowa, 608, the mother obtained a divorce; and the custody of the child, a boy of six or seven, was awarded to her. Two years later the father applied for its custody. It was awarded to him. The court remarked, ''The unsuitableness of the mother was not shown to be marked, but the evidence did show that she labored to estrange the child from the father and this tends to exercise a deleterious effect upon the child.'' In Miner v. Miner, 11 Ill. 43, l. c. 52, it is said ''The child, though in the custody of its mother, is a ward of the court, and any attempt

on the part of either parent to alienate its affection from the other would be held to be an abuse of the child, which the court would consider it a solemn duty to prevent." In Wilson v. Mitchell, 111 Pac. 21, l. c. 30, it is said "The explanation of the aversion of the child to his parent is not satisfactory when it is remembered that prior to this contest there was no aversion but the tenderest love and affection. . . . The aversion has to some extent been instilled in the child, and if plaintiffs in error retain possession of him, the estrangement will be still further increased. Under such circumstances it is of prime importance to protect as far as possible, the welfare and happiness of this child of tender years from the effects of the loss of respect and affection for his mother." In D'Alton v. D'Alton, 4 Prob. Div. 87, l. c. 90, the court said: "If either parent should make use of the access and influence over the child against the other parent, I should interfere to deprive the disobedient party of the right of access." In Miller v. Wallace, 76 Ga. 479, the contest was between the maternal grandparents and the father, and the court at page 493, said: "The plaintiffs seem not to regard them (the mother and sisters of the child's father) as socially their equals and look upon them rather as their inferiors in point of culture and refinement, but this estimate of their character and fitness for this delicate trust is not borne out by others who have testified in the case. The plaintiffs are evidently prejudiced against the defendant and his family, and if his child is committed to their exclusive care and management there is danger at least that they might instill it with their prejudices and great aversion and distrust instead of the love and confidence she should habitually cherish for him and which according to the laws of God and man is his due." In Dimmitt v. Dimmitt, 167 Mo. App. 94, l. c. 103, the court in awarding a child of two years to its mother, said she must not act so as to cause the practical es-

trangement and separation of his child from the father, and that if the mother "should attempt to discourage the father's proper visits by making them difficult and disagreeable, she will suffer the penalty of having her child taken from her."

It is urged in plaintiff's behalf that she should not be held responsible for the grandmother's acts or influence over the child. But the evidence clearly shows that the two women were of the same mind concerning many things; that Mrs. Shouse was the mother's agent and other self in matters pertaining to the boy, and that all the mother's requests and business communications were transmitted by and through her mother, Mrs. Shouse. The evidence also clearly shows that the mother neither objected to nor made any effort to counteract the influence of Mrs. Shouse, or to remove the atmosphere of suspicion and distrust concerning his father with which the boy was surrounded. She admitted that she never spoke to her son concerning his father during all the years she had him in her household except to communicate the fact to him that his father desired to see him; that she never told him his father was a good man, and never said anything to him about his father one way or the other. She may not have been aware of the precise language used in some of Mrs. Shouse's remarkable communications, but it is inconceivable that she was not aware of the general feeling and spirit Mrs. Shouse was manifesting toward the defendant, and of the effects thereof produced upon the plastic mind of the child.

Under these circumstances what shall be done with the boy? Shall he be allowed to remain where he has been, to grow up with false views of life and erroneous notions concerning the character and good name of his father and the real worth of his paternal ancestry? When he was examined by the judge in his chambers at the first hearing in May, 1914, the boy displayed remarkable strength of intellect and powers of under-

standing for one of his age; and yet to questions asked
if he was not aware that his father was a talented
successful lawyer, a good man, and stood well in the
community, the boy's invariable answer was "I don't
know."

The mother has had this boy during his tender
years, and he is now appproaching that period when
a boy begins to escape from his mother's apron strings
and when he needs a father's guiding hand and direct-
ing influence. Shall we permit sentiment and sym-
pathy for a mother's desires to control and determine
our action? The natural rights of a parent should not
be disregarded it is true, but the best interests of the
child must be primarily consulted. And in this case
it must be remembered that it is a parent on *each* side
who is asking for the boy, for one of whom the child
is likely to lose his affection, and to look upon that
one with dislike and suspicion though that parent has
been the supplier of all his material needs even the
home in which he has been sheltered.

In Lusk v. Lusk, 28 Mo. 91, 1. c. 93, it is said: "The
leading principle is to consult the good of the children
rather than the gratification of the parents." In State
v. Giroux, 19 Mont. 149, 1. c. 160, the court, speaking
of contests between parents for the custody of their
children, says "in the adjustment of these conflicts
mere sentiment and involuntary sympathy have no
place." "No sentimentality should attend proceedings
of this character, but the permanent interest and wel-
fare of the child should be the great aim and end to
be attained." [Schneider v. Schneider, 143 S. W. 265,
1. c. 266.] In the case of In re Steele, 107 Mo. App. 567,
1. c. 569, it is said: "While courts recognize and ap-
preciate the claim of the mother to her child, yet no
mere sentiment is allowed to overcome a consideration
for the welfare of the child itself." In Hibbette v.
Barnes, 78 Miss. 695, the court says that in inquiries
like this "We have not solved the trouble until we have

come to a sound comprehension of what the law embraces in the scope of that phrase 'the best interest of the child.' '' And in the course of the opinion the court remarked that ''Too much disposition is manifested in some cases to consult, not the permanent well being of the child so much as its immediate enjoyment; to stand, not at the center of the whole circumference of the facts making up the life of the child from childhood to manhood or womanhood, but in that segment of those facts relating to what merely will make the child happy at the age he may be when the custody is determined.'' And then, in giving what it thinks is meant by the best interest of the child, the court says: it is ''that which, in the whole view from the age at which the children are when the court is called upon to decide to the years of majority, most surely will build up fine characters and make them fit for the successful discharge of the duties devolving upon them as men and women; not that which merely gilds with rainbow hues the childhood sky.''

Under all the circumstances disclosed in this record, many of which it is deemed best not to specify more particularly than has been done, we think the chancellor was right in his decree of June 4, 1914, when he awarded the custody of the boy to his father. Looking to the future, and taking into consideration the whole of his career and the proper equipment he should have to meet the responsibilities of life, we believe that the influence and training of his father and the benefits of his father's society are what is best for him now. He is about to enter upon one of the most critical periods of life and needs a father's advice and direction; and it is of vital and far reaching importance that he should know of his father's love, and have respect and confidence in him.

With regard to the modification of the decree by the order of September 22, 1914, we do not think there was anything shown to have transpired since the de-

cree of June 4th requiring such modification. It is not necessary to decide whether the court *had power* to modify the former decree at this subsequent term in the absence of any new facts arising to justify a modification, as the decree of June 4th seems to be, on its face, a temporary and experimental order, not intended as a final adjudication of the matter but only as a preliminary disposition of the boy in order to see how matters would work, and to enable the court to finally make up its mind as to what should be done. What we mean to say is that there was nothing developed on the latter hearing really militating against the father's fitness to have charge of his son or reflecting on his care and disposition of him during the summer. The evidence failed to show that the school at which the boy was placed was unfit or improper, or that his physical, moral or spiritual needs were neglected and ignored. The school is undoubtedly one of the best of its kind in the United States. The most that can be said against the advisability and wisdom of the father's disposition of the boy during the summer is that the boy was far from home and alone among strangers. However, in the main, he seems to have been happy and contented while there, though, of course, in his correspondence with his mother he expressed a very natural desire to see her; but his growth and splendid physical condition negative any idea that he was not well cared for or that he suffered any real injury or harm.

It is said that this placing of the boy off at school shows that the father does not really desire the society of his child, and that it displays a want of sympathy for him and a lack of regard for the boy's feelings. We do not so regard it. The situation in which the father was placed should be borne in mind. Although the decree gave him the custody of the child it was plainly a temporary trial arrangement, to last only for a short time, at the end of which the boy was to be

brought back into court with the whole matter of his custody open for consideration. The time afforded was entirely too short for the father to establish any permanent arrangement for the custody of his child nor indeed could he do so as long as the question of final custody remained open and undetermined. The evidence shows that while, and so long as, the father and his present wife were away from Kansas City, the relations between them and the boy, who was with them were loving and pleasant, and the old feelings of confidence and respect were in process of being restored; but a return to Kansas City marked the revival of the unfavorable indications and unpleasant experiences. If the father kept the boy in Kansas City he could not refuse to allow him to visit his mother's household frequently, and hence the situation would be no better than before. Besides, there is evidence to the effect that the boy while in Kansas City was being subjected to the unpleasant notoriety produced by this contest, and it was, therefore, best for him that he be taken out of the zone of that influence. The boy had lost practically one school year during his second trip to Europe. After the decree of June 4th he had expressed to his father a desire to attend West Point and manifested considerable taste and interest in military matters. Therefore, thinking the boy could catch up the year he had lost, and that it would be best for him at this time to get away from the conflicting influences of two households and the turmoil and strife of his parents concerning him, the father took his son to this Academy for boys where he could be taught habits of regularity, self control, neatness and obedience, and receive training that would prepare him to enter West Point should he continue in his desire for a military career. It may be that the boy was too young to have any final or definite ideas as to a military career, and doubtless his expressed preference therefor was but the manifestation of a boyish love for

the mere showy attractions of a military life.  But the father should not be blamed for responding to what he thought.was the manifestation of the boy's natural bent and make-up.  Nor do we attach any importance either way to the fact that the boy, having spent a summer in.the school in question, from which he could see West Point at close range and obtain a better knowledge of what a military career involves, has now no desire therefor.  It neither means that his experiences of the summer were a hardship upon him, nor that his mother subsequently influenced him to change his mind in regard to the profession of arms.  It is rare that a boy of his age has any well founded idea as to what he is to do or be; but the training he was getting at this school, while it had military features, was in reality of a general educational nature,  and would prepare him to enter any field he might afterwards choose.  The father was not attempting to arbitrarily force upon him a profession regardless of the boy's wishes and desires.  We agree with the trial court that what the boy needs now most of all is a place in his father's home and the companionship of his father *as a comrade;* and that is what the father must give if the latter is to regain the place he once had in the affections of his son.  But in the short time allotted to the father under the order of June 4th, there was no opportunity for this to be accomplished, under the circumstances in which both father and son were then placed.  The evidence is that the father proposes to take the son into his home and be a comrade to his boy if the latter be given definitely into his control.  It is upon this understanding that we make the disposition hereinafter directed.

There was no evidence offered at the hearing in May and June to controvert the facts presented by the father in support of his claim for the custody of his boy.  And at the September hearing the sole issue was as to the care taken of the boy during the summer.

There was no evidence adduced at this time calling for so great a modification of the terms of the order made in June. The evidence justifying the placing of the boy in the father's custody was just as strong and impressive in September as it was in June, and no facts were shown to impeach it. We are unable to see anything to justify the divided custody made by the last order. According to it the boy is to be "under the direction of his mother" from five p. m. Friday of each week till five p. m. Sunday, and from June 10th to August 1st of each year. Consequently the father has no opportunity to see or be with his boy on Saturdays and only for one-half of ten Sundays in the year, and never at Christmas time. This division of authority would, in our opinion, result in great harm to the boy. Neither parent could exercise any salutary control under that situation and the conditions disclosed by the evidence in this case would not improve but grow worse. The Highest Authority has said, "No man can serve two masters," and He understood humanity as no other ever did. A divided custody will undoubtedly keep the child constantly embroiled in his parents' dissensions. He "should have a home with the one or the other of his parents and not be shifted from one to the other at brief intervals." [Dimmitt v. Dimmitt, 167 Mo. App. 94, l. c. 103.] It is detrimental to the welfare of a child to shift it from family to family. [State ex rel. v. Bird, 253 Mo. 571.] The child should not be troubled with its parents' quarrels. [D'Alton v. D'Alton, 4 Prob. Div. (Eng.) 87.] They should not be made "the sport of never ending contests between rival claimants for their custody and control" nor a "bone of contention, an apple of discord and constant *casus belli* between them." [People ex rel. v. Brooks, 35 Barb. (N. Y.) 85, l. c. 87.]

Since the submission of this case we have been informed, through supplemental briefs filed by both sides, that the father has removed from Kansas City

and has established his home in Washington, D. C. This requires us to notice that feature of the decree which speaks of the residence of the parties, and to also determine the question of the removal of the boy to Washington City.

The divorce suit and decree therein rendered in the circuit court of Jackson county vested jurisdiction in said court to pass upon the custody of the child, and that jurisdiction continues until the boy reaches his majority. [Wald v. Wald, 168 Mo. App. 377.] Both parents were parties to the divorce suit and hence are personally bound by its decrees and orders. And those orders are controlling upon and will be recognized by the courts of other States. So that a removal of the child to Washington City is not a taking of the child beyond the jurisdiction of the court in the sense that the court would thereby lose jurisdiction to change its order in the future should subsequent events require it. The jurisdiction of the court over the child will not be ousted thereby. [State ex rel. v. District Court, 128 Pac. 590, l. c. 593; Morrill v. Morrill, 77 Atl. 1; Stetson v. Stetson, 80 Me. 483, l. c. 485; Bailey v. Schrader, 34 Ind. 260; Wakefield v. Ives, 35 Iowa, 238.] In the Stetson case it is said the awarding of the custody to a parent may result in the removal of the child beyond the limits of the State in any case, since there is no authority, except in cases of crime, to prevent the parent's immediate removal to another State; but that since jurisdiction has attached, then even though the parent and child may not be personally within the jurisdiction of the court, the subject-matter is and the court's judgments will be valid and binding.

The courts have not hesitated to allow a parent, to whom the child has been awarded, to take it to another State, or even to a foreign country, when the best interests of the child would be subserved thereby. [Tatum v. Davis, 144 Mo. App. 125; In re Bullen, 28

Kan. 781; Stetson v. Stetson, supra; Wilson v. Mitchell, 48 Colo. 454; Ex parte Davidge, 72 S. C. 16; Wood v. Wood, 5 Paige's Ch. (N. Y.) 596; Campbell v. Campbell, 37 Wis. 206; Griffin v. Griffin, 18 Utah, 98, l. c. 110; Giles v. Giles, 30 Neb. 624; Adams v. Adams, 62 Ky. 168, l. c. 170; Bedolfe v. Bedolfe, 127 Pac. 594; United States v. Sauvage, 91 Fed. 490; Freeman v. Freeman, 94 Mo. App. 504, l. c. 507; Brown v. Brown, 53 Mo. App. 453.] As showing what the parties thought concerning the residence of the child in Kansas City when they entered into the contract of November 9, 1909, it may be well to observe that said contract provides that "the wife at this time [is] neither to be understood as fully assenting to the continued residence of the child in Kansas City, Missouri, nor as definitely objecting thereto; that matter being left open as hereinafter provided." The provision referred to called for the matter to be settled by the court in case the parties could not agree upon a proposed change of the child's residence. During the years the child has been with its mother she has twice taken it to Europe, being at one time away from the United States from November till July.

So that unless the removal of the child will injuriously affect its welfare, there is no legal reason for refusing the father permission to do so. But no objection on the boy's account can be made to Washington. We take judicial knowledge of the fact that Washington City, the capital of our country, is an excellent place for the residence of this boy. The educational features and opportunities there afforded are unsurpassed anywhere. The only question that can be raised against taking the boy there is that his mother will be deprived of the opportunity of seeing him. But this can be provided for. Again, as intimated hereinabove, we believe that it is best for the boy to get away from the scene of this unhappy contest and be free from the conflicting influences of two households

so diametrically opposed in their thoughts and feelings toward each other and in their views of what is of real worth in American life. The father has never shown the least desire to prejudice the boy against his mother; on the other hand, in the limited opportunity he has had he has endeavored to teach him to respect and love his mother and to be careful in observing his duties to her. So that there is no danger of the boy ceasing to love his mother.

We are, therefore, of the opinion that the cause should be reversed and remanded with directions to award the custody of the boy to the father and that he be permitted to take his son out of this State to the city of Washington where he now resides; that the mother be permitted, at convenient times and periods, to visit her son at Washington amid suitable surroundings and under as pleasant conditions as the situation will permit, neither parent to do anything, either in spirit or by word or deed, to keep alive in his mind the unwholesome memories of the differences which unhappily have affected and separated them. The boy should correspond regularly with his mother and she must be kept informed as to his health, development, progress and welfare. And lest the expense of the visits to see her son be too heavy a tax upon the mother and too great a limitation upon her opportunities of seeing her boy, the latter is to be permitted to visit his mother for a month each year during vacation, the expense of the boy in going from and returning to his home to be borne by the father. It is assumed, of course, that care will be taken during these visits to avoid everything which may have a tendency to lessen the father's influence, else this may result in the discontinuance of such visits. The parties to this suit, and it is hoped the boy also in a year or so, cannot fail to see that it is to the best interests and happiness of all concerned, especially of the boy himself (whom both parents love), that all should earnestly

and unselfishly strive to make the best of the situation. Under the circumstances, no arrangement can be made that will not involve pain and sorrow, and, stricken hearts should and must be guided by that unselfish love which "seeketh not its own."

The judgment is reversed and the cause is remanded with directions to enter a decree in accordance with the requirements hereinabove set out. All concur.


ON MOTION TO MODIFY DECREE.


TRIMBLE, J.—Since the announcement of the foregoing opinion, plaintiff has filed a motion praying that the decree be modified in a number of particulars. Each of these has been carefully considered. We have no desire to make the terms of our decree any harder to be borne than necessity requires; and are, therefore, willing to make any modification which does not materially change the disposition of the case as made in the foregoing opinion, and that will not interfere with or affect the real welfare and best interests of the child. We are, however clearly of the opinion that, with possibly one exception, all of these suggested modifications should be denied. Some of them have for their basis reasons which could be advanced against any disposition of the child that might be made, and they rest on nothing more than what might be conceived of as a possibility in the future though there is nothing in the evidence to justify the thought that they will arise. Certain other requested modifications should be refused because the result of their adoption would be to subject the boy to the injurious effects of divided authority which it is so important to avoid.

Still others, we think, are wholly unnecessary as there is nothing in the evidence to justify their insertion in the decree and, if included, would involve a gratuitous assumption upon our part unnecessarily reflecting upon the parties hereto. Our decree is made

upon the assumption, and we confidently expect, that not only the parents of this boy and the boy himself but every one else connected with this unhappy controversy, will so conduct themselves as to assist, in good faith and to the utmost of their ability, in carrying out the spirit and intent of this decree.

. With regard to one suggested modification, however (the exception above noted), we have concluded, not without some hesitation, that its adoption will not affect or interfere with the purpose sought to be accomplished by the decree. If future experience should develop that it does so interfere, then it, like any of the other terms of the decree, can be changed. That modification is this: In addition to the visit of one month during the summer vacation of each year, hereinbefore provided for, the boy shall be permitted to visit his mother for one full week at the Christmas Holidays, the mother to bear the expense of such Christmas visits. This modification of the decree will be a break in the eleven months separation of mother and son, and, if they make good use of the privilege thereby granted, no ill effects can come therefrom. It is in the confident belief that they will do so that this modification of the decree is made. All concur.