242 S.W.2d 307 (1951)
FORDYCE
v.
FORDYCE.
No. 28150.
St. Louis Court of Appeals, Missouri.
September 11, 1951.
Harold I. Elbert, Charles M. Spence, St. Louis (Thompson, Mitchell, Thompson & Douglas, St. Louis, of counsel), for appellant.
Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, for respondent.
HOUSER, Commissioner.
This is a motion to modify a decree of the circuit court rendered in 1944 awarding major custody of Nancy and "Cam" Fordyce to their father, C. Powell Fordyce. Their mother, now Mrs. Henry B. Hosmer, unsuccessfully sought the modification and now appeals from the judgment overruling her motion to modify.
That motion, filed April 5, 1950, alleges that the parties were married in 1928; divorced in 1940; that the original decree awarded the mother major custody of the two children; that in 1943 after a hearing a decree was entered awarding the father general custody with the right to the mother to have custody in the City or County of St. Louis at stated times during the summer and Christmas season; that on joint petition of the parties the court on June 12, 1944 modified the 1943 decree to allow the mother to remove the children from the State of Missouri during the periods of the summer custody; that the court in 1948 declined to modify the 1944 decree on the motion of the mother; that Nancy and Cam were 9 and 5 years of age in June, 1944, and that Nancy became 15 years of age in January, 1950 and that Cameron will become 12 years of age in August, 1950; "that the said children have frequently and persistently, especially since the last hearing in this matter in 1948, expressed unhappiness over living with their father and stepmother, and their desire to spend the greater part of their time with defendant and her husband, and that said children have now attained ages which entitle their desires in this regard to great weight with the court"; that the mother and her husband own a home at *308 Concord, Massachusetts, and are well able to provide a home for the children and are desirous of having the children live with them. The mother prayed for general custody.
Bearing in mind that our first and foremost duty is to so rule as to best promote the interests and welfare of the children, we must determine whether the moving party has shown by a preponderance of the credible evidence that there has been such a change of circumstances since the 1944 decree as to require a change in the decree, Shepard v. Shepard, Mo.App., 194 S.W.2d 319, loc. cit. 323; Olson v. Olson, Mo.App., 184 S.W.2d 768, loc. cit. 772; Crooks v. Crooks, Mo.App., 197 S.W. 2d 678, loc. cit. 681; Schumm v. Schumm, Mo.App., 223 S.W.2d 122, loc. cit. 126, and whether the welfare of the children requires a change in the provisions for their custody. Schumm v. Schumm, supra; Hensley v. Hensley, Mo.App., 233 S.W.2d 42, loc. cit. 43; Watkins v. Watkins, Mo. App., 230 S.W.2d 778, loc. cit. 783. In making this determination the appellate court must not lightly disturb the judgment of the trial court. Instead we will defer to the trial court unless its judgment is in conflict with a clear preponderance of the evidence and discloses a manifest abuse of judicial discretion. Garvey v. Garvey, Mo.App., 233 S.W.2d 48; Stokes v. Stokes, Mo.App., 222 S.W.2d 108. In that event we should direct the entry of such judgment as we deem proper under the law and the evidence. Watkins v. Watkins, supra.
The position of appellant, simply stated, is that in the Fordyce home there is an absence of affection and a poor home atmosphere in which the children are unhappy, ill-adjusted and do not feel a sense of security; that the relationships between Nancy and Cam, their father, stepmother and half brother have deteriorated and are becoming progressively worse; that Nancy and Cam are old enough and sufficiently mature to form a rational judgment and to exercise an intelligent preference with respect to their custody; that their wishes "should be given very great weightif indeed they should not be treated as controlling"; that they strongly wish to spend the major portion of their time in the home of their mother and stepfather, where they are happy and secure and where they find congeniality and contentment, and are welcome. To establish her case the mother, in addition to her own testimony, offered that of the two children, a Dr. Rupe, a deposition by Virginia Ham, and certain documentary evidence. Neither in the 1948 nor in the present hearing did Mr. Hosmer testify, either personally or by way of deposition.
Following the granting of a divorce to Mr. Fordyce in 1940, both parties remarried in 1941. Appellant married Henry B. Hosmer, who is a member of a law firm in Boston, Massachusetts. The Hosmers live near Concord, Massachusetts in a 13-room colonial residence on 190 acres of land which they bought in 1947. Mr. Fordyce married Ruth O'Reilly. Mr. Fordyce is a member of a law firm in the City of St. Louis. The Fordyces live in that city in a family home at 27 Lenox Place. Powell and Ruth Fordyce have one son, Bobby, born in 1943.
Mrs. Hosmer testified that the children are not mentally or emotionally satisfied,are not happy in their father's home; that they have "suffered greatly from this prolonged quarrel"; that they will have a growing resentment "so long as the children are held by their father against their will"; that he is "the one that is standing in the way of the realization of their wishes"; that both the children wish to come and live with her and have written her many times expressing this desire. She introduced in evidence 8 letters written by Cam to "Dear Mommie" or "Dear Mommie and Uncle Henry" between September, 1948 and March, 1950 in which he stated that he missed her and wished he was living with her and Uncle Henry. In one of them he inquired "When are you going to ask the judge again?" Four of Nancy's letters written during the same period were introduced. One of them, written a few days after the decision in 1948, read "Dear Mommy and Uncle Henry Gosh it's terrible about the decision. Cam cried horribly after you told us. Don't you think *309 we can ever get it changed so that we can live with you in the winter and Daddy 5 weeks in the summer. I hope so. * * * Love, Nancy." Three other letters contained expressions that "I wish I was there in Concord with you and Uncle Henry" or of similar import.
Mrs. Hosmer expressed her opinion that since 1948 there has been a change of feeling between her children and Bobby; that as a baby and during his preschool days they were "both crazy about him"loved him very muchbut now that he is growing up to be a person and is asserting himself they have a strong feeling that the Fordyces discriminate against them in the matter of treatment and discipline; that they are strict with them but not strict with Bobby; that they have a well-developed feeling that all conflicts with Bobby are blamed on them. While they formerly spoke of Bobby with love they do not do so now but regard him as a "spoiled brat" and a "nuisance". She asserts that there is a change of circumstance in that Cam is coming into adolescence and that Nancy, maturing, needs intimacy with an older woman whom she loves and trusts; that Nancy does not want to confide in her stepmother, and that she needs her mother. She stated that letters addressed to the children at their home were not being delivered to the children. She suspected that the present Mrs. Fordyce was opening and reading her letters to the children; believed that if she mailed letters to the Lenox Place address the stepmother might not give the letters to the children. Mrs. Hosmer calls the children every two or three weeks by long distance telephone from Concord, Massachusetts, and oftentimes asks them if they have received her letters.
Nancy testified that she told her father that she wanted a change in the custody because "I wasn't happy in St. Louis and wanted to be with my mother * * * I told him because I didn't love Rudy." Rudy (nickname for Ruth) is the name by which the present Mrs. Fordyce is known to the children, including her own child. Nancy said that she was happier in Massachusetts with her mother than in St. Louis with her father; that home with her father is like a "boarding school". She thinks Rudy would keep letters addressed to Nancy from her mother; that Rudy kept one addressed to Cam. She denied that she consulted Rudy about her problems; said she would not feel free to take up her problems with Rudythat she was not trustful; said that "she might laugh at my problems"; that she "guessed" she loved Rudy but "I don't think I think too much of Rudy." Later in her testimony she said she "dislikes" Mrs. Fordyce. She stated that she hates to invite friends to the home for fear something will happen to make them feel bad; that other mothers are friendly to girl friends visiting in the home. When asked to be specific about her complaint in the home she said "Well, it is Rudy mainly," although she stated she was not complaining of Rudy's discipline. She said that she loves her father and that he is a good father; that she has everything in the world she wants "except I want to live with my mother"; that she would like to come and visit her father 5 weeks in the summer but would rather stay most of the time with her mother"practically all my time"; that she loves her father less than at the time of the last hearing in this case in 1948. She blames her father for her not being with her mother. She thinks that her father broke a promise he made to her mother to let her live with her mother during the winter time. Appellant testified that an office copy of a letter from respondent was left by Mrs. Hosmer on a dresser, found by Nancy, and read by Nancy with the permission of Mrs. Hosmer. Nancy gained the impression from this letter that such a promise had been made. Although counsel promised to produce the letter it was never introduced in evidence.
Nancy stated that she was fond of Bobby when he was little but that now "if he does something he doesn't get punished for it, but if Cam would do the same thing he would get punished." As an example, if Bobby put his elbows on the table he wouldn't be disciplined but if Cam does the same thing he is sent out of the room. On cross-examination however she stated *310 that she had no complaint about her father's discipline. In any event she said "I don't love Bobby" and when asked if she meant it said "Sure I mean it." She had no complaint about the John Burroughs School where she attends; thinks it is a very good school. Nancy stated that she liked Uncle Henry very much; that she had had no serious difficulty with him; that he is very understanding; that she feels free to go to Uncle Henry with her problems; that he does not attempt to boss her; that on the island "we sail, swim, fish, have square dances, ride horses and do everything there is to be done on a picnic." She stated that she had a wonderful time there last summer.
Cam testified that he is unhappy living with his father and Rudy "because of them." When pressed for a reason for this dissatisfaction with his father's house he said "I don't know"; that he doesn't like Rudy very well; "I don't like her too much"; that he has occasional quarrels with her; that he wants to go to live with his mother because he loves his mother; that he would feel free to go to his father for counsel if he had any problems. This exchange occurred:
"Q. Do you love your father? A. I like him.
"Q. You like him. Do you love him? A. Yeah, uh-huh.
"Q. Sure you love him? A. Uh-huh."
Although he testified in 1948 that he loved Bobby, he testified in 1950 "I don't like him too much now." He spoke of quarrels; that Bobby could place his elbows on the table and not receive an admonition but that he would be punished for the same thing; that Bobby would "take his things" and keep them and play with them; that Bobby put his baseball mit under the kitchen stove; that Bobby hits him and bothers him while he is doing his school work; and tells on him. Cam told his father that he wasn't unhappy about anything except that he wanted to live with his mother; and that he did not want to go east to school on account of any difficulty he was having with anyone in St. Louis but that he just wanted to go to Concord, Massachusetts, because he loved his mother. Cam said he put a mark on the flap of a letter addressed to his mother "to be sure it wasn't opened," expressing a suspicion that his mail is read. He said that he likes country life, that he doesn't like city life "so good". Cam testified that he likes Uncle Henry "very much", loves him, and wants to live with him. Mr. Hosmer taught him to sail; goes fishing and swimming with him and is helping him with an extensive tree planting project in which the boy is interested. Mr. Hosmer plays the piano and the children sing with him. He wants to spend the school terms with his mother, coming back to see his daddy in the summer time. He stated that after he graduated from Community School in June, 1949 he asked his father if he would "let us go and live with mother, and he said that was all up to the judge." Cam testified that he likes his school in St. Louis, and that he likes the trips on which his father takes him, testified about the baseball stop his father erected in the back yard, movies he attends, his clothes, his school, the teachers and students, and that he is happy with his class.
Virginia Ham, a neighbor of Mrs. Hosmer, has seen the children two or three times a week during the summers and Christmas periods they have been with Mrs. Hosmer, both in her home and the Hosmer home. She testified that the children engaged quite happily in their various activities and seemed affectionate toward their stepfather as well as toward their mother. On one occasion in the summer of 1948 at a baseball game Nancy said, "Oh, I wish I could stay here, I'd so much rather stay with Mummie and Uncle Henry than go back to St. Louis." This sentiment was repeated around Christmas 1949. On one occasion during that period Mrs. Ham asked Cam whether he felt the same way and he said, "Yes, Mrs. Ham, I certainly do. I'd much rather stay here with Mummie and Uncle Henry and go to school in Concord." She testified that Cam broke something belonging to Mr. Hosmer in 1949 and that Nancy said "Oh, Daddy would be awfully mad, Cam, but Uncle Henry will understand."
*311 Dr. Wayne Rupe talked with the children separately in relation to their custody. They definitely stated to him that the change of custody would be entirely desirable to them. Cam said he would have no hesitancy about leaving his friends; that he had a great many friends in the east and would not be unhappy. Nancy said that she would very much like to spend the next several years with her mother. In the opinion of the doctor the children are unusually mature for their ages. He believed the children would be perfectly happy with the change and that if it would increase their happiness it would be to their best interest to spend the major portion of their time with their mother, stating "In the last long analysis I feel that individuals do better if they are happy all over, not half way. Most people do better if they are happy than if they are not, and a thousand factors could enter into that."
The private schools in Concord are comparable in quality to the schools the children attend in St. Louis. The children are familiar with the schools in Concord and have friends at both Concord Academy and Fenn School.
Respondent's evidence concerning the relation between Nancy and Cam and Bobby showed that Bobby and Cam often join in a game with their father in the morning in which they hide under the beds and put clothes under the covers so as to "fool" Mr. Fordyce when he tries to awaken them; that each of them gets into the other's bed; that they play, take bicycle rides, and oftentimes laugh together; that Cam helped Bobby learn how to ride a bicycle; that Cam bought a present for Bobby on a trip he took with his father to the Lake of the Ozarks; that during a period of several years while riding to school with Bobby in Dr. Zentay's car four mornings each week Cam showed normal affection and solicitude for Bobby; that Nancy, of her own free will and in order to earn 50¢, often takes care of Bobby when the Fordyces go out in the evening; that Nancy begs to take Bobby to the store with her; that Nancy helped teach Bobby to ride a bicycle; that Nancy bought presents for Bobby with money which her father had given her for herself while on a trip to New Salem, Illinois; and that friends of the Fordyces visiting in their home have seen no evidence of bad feeling between the children.
With reference to relations between Mr. Fordyce and Nancy and Cam, Mr. Fordyce testified that he never at any time failed to deliver to the children any letters addressed to them in his care by Mrs. Hosmer and that he never failed to mail letters to Mrs. Hosmer given him for this purpose by the children.
Mr. Fordyce accounts for Nancy's statement that her love for her father has diminished by reason of a "fictitious grievance carefully planted in her mind by her mother, in order to prejudice the child against her father, and to influence her to say that she prefers to live with her mother." In support of this theory respondent points to the testimony that Mr. Hosmer's law partner, Mr. Samuel Hoar, advised Mrs. Hosmer that the children's wishes would control when they become 14 years of age; that when Nancy was about 11 years of age she wrote (from Massachusetts) to Mr. Fordyce asking him whether he would rather have her "live with Mummie in the summer and you in the winter and not like you a bit, or you in the summer and Mummie in the winter and like you very much," and that Nancy stated that her mother would not let Nancy mail the letter because "she did not think it was time for it"; and the leaving of the letter, supposedly containing a promise made by the father to let the children live with the mother, in a place where Nancy would find and read it. After the 1948 decision Mrs. Hosmer wrote Nancy "We are about like the English; we lose battles, but we never lose a war." She also wrote to Cam "* * * it is a dreadful disappointment for us all, but you will remember it can't go on very much longer and we will keep trying. * * * sooner or later we are certain to succeed."
There is no evidence that either of the Fordyces has ever sought to lessen the affection of the children for their mother. In contrast Mrs. Hosmer has never told the *312 children to love and respect Mrs. Fordyce, although she has not told them not to respect her.
With respect to the charge that Nancy failed to discuss her personal problems with Mrs. Fordyce and does not love her, Mrs. Fordyce testified that Nancy frequently discusses her boy friends with Mrs. Fordyce, and freely talks to her; that Nancy will come into the room on Saturday mornings while she is mending, lie down on the floor on her back with a pillow under her head, and that they have "very intimate discussions on adolescence, adolescent behavior and other problems"; that they discuss Nancy's problems while they play Canasta together and lie together on Nancy's bed under an ultraviolet lamp; that on one occasion Mrs. Fordyce told her that she and her father were "standing by" and that Nancy could always come to her with her problems and that Nancy responded "Gosh, Rudy, it is a wonderful feeling to know that."
Nancy admitted that Mrs. Fordyce had never said anything to Nancy's friends which would upset them. Mrs. Fordyce testified that Nancy frequently invites girls to spend the night with her. Her special beau oftentimes comes to see her at her father's home. It was conceded by all that about a month before the hearing Nancy had a dance at her home for about 45 of her friends. Although Nancy said that she plays Canasta with Mrs. Fordyce because Mrs. Fordyce would be displeased if she did not do so, Nancy previously testified that she likes to play Canasta with Mrs. Fordyce and asks her to do so; that Nancy taught Mrs. Fordyce to play the game. Mrs. Fordyce testified that she and Nancy have friendly games four or five times a week. Mrs. Franciscus testified that Nancy had good times playing Canasta with Mrs. Fordyce.
Concerning the interception of letters, there is evidence that Mrs. Hosmer addresses letters by registered mail return receipt requested in care of their father at his office; addresses letters to the children at their school; and has often told the children to personally mail the letters they writethat neither Mr. nor Mrs. Fordyce has a right to see their letters. Mrs. Fordyce positively testified that she has never opened a letter addressed to the children or failed to mail a letter which they requested her to mail.
Respondent's testimony as to the feeling of the children toward Mrs. Fordyce indicated that Nancy often asks Mrs. Fordyce to help her with her homework; kisses her on returning from school, works with her in preparing refreshments for parties; has her wash her hair every week; borrows her clothes and costume jewelry, requests her help with piano practice; that Nancy and Cam sing together while Mrs. Fordyce plays the piano; that Nancy never has any quarrels or unpleasant experiences with Mrs. Fordyce; that Nancy laughs and sings around the house; has Mrs. Fordyce help her get dressed for parties; that Mrs. Fordyce helps Nancy knit sweaters and make clothes; that they frequently make fudge and cookies together and that Nancy appears to be happy at home, often puts her arm around Mrs. Fordyce, does not complain of her discipline and has no complaints regarding food, school or clothes; the children's doctor has seen no evidence of strained or unpleasant relations or lack of companionship between Nancy and Mrs. Fordyce but only a normal relationship between them. Mrs. Fordyce made a corsage for Nancy to give to her beau on one occasion and Nancy often runs upstairs to show the Fordyces flowers given her by her boy friend.
There is evidence that Cam has often told Mrs. Fordyce that he loves her; that they get along particularly well with each other; that he shows no evidence of dislike for either Mr. or Mrs. Fordyce; oftentimes sings when he awakens and sings around the house; has shown no evidence of unhappiness at home and settles his affairs with Mrs. Fordyce quietly and easily; that he often goes to school with her and rides home with her, asks her to help him with his homework, kisses her when he returns from school, kisses her goodnight, plays cards with her, shops with her, sings while she plays the piano, asks her to help him *313 get bottle caps for his collection, enjoys the special apple pie which she prepares for him, asks her to attend school functions in which he takes part, writes to both Mr. and Mrs. Fordyce in the summer time when he is in Massachusetts, and that Mrs. Fordyce has never had a real quarrel or unpleasant experiences with Cam.
There was a great deal of testimony with respect to the work of the children in the school. Briefly summarized, the report cards and the teachers indicate that while Cam's spelling is not too good, he works hard, receives fair, good and excellent grades in various courses, shows a very serious attitude, a good memory, cooperative spirit, excellent responsiveness and interest in current problems, makes use of his opportunities, is dependable, assumes his share of responsibilities in group work, is conscientious and anxious to learn, has considerable technical skill, learns from experience, uses his class time well, and is self-reliant. He is a healthy, normal, well adjusted and well-organized boy, according to the principal of Community School, who said that his outstanding characteristic is good sportsmanship; that he is popular and exhibits no evidence of an upset home life or unhappiness; that he is smiling a good deal of the time. There was medical and other corroborative evidence to the effect that Cam is a normal, healthy, happy boy, well-mannered and well trained.
Nancy's reports indicate good to excellent grades, and that in some subjects she does more work than is required of her, is a dependable pupil, has learned to apply knowledge accurately, has cooperated well, quickly grasps new ideas, is prompt with her work, interested in doing well, talented and quick to understand the suggestions of her teachers, shows quick thinking and comprehension, turns out fine results at times, although she works by spurts and her work is not altogether consistent. Her teachers indicated that she shows no evidence of unhappiness, is often laughing and smiling; that there is no behavior problem; that she has made eight school teams, is jovial and laughing, is a well mannered child liked by other girls, socially and scholastically well adjusted.
There is evidence that the children regularly attend Sunday School and that Nancy is a teacher of a Sunday School class. The evidence of quarreling and conflicts between the children, considered in its proper perspective, reveals no deep-seated and underlying maladjustment, but rather exemplifies the trivial quarrels which occur in almost every normal household of children. The trial judge no doubt considered the difference in the ages of the children, which is a significant circumstance in appraising the seriousness of these minor quarrels.
On this evidence the court found that the relations between the three children and between Nancy and Cameron and Mrs. Fordyce "are friendly, normal and wholesome"; and that they have been given a "normal, wholesome and happy home life" by which they have developed into "normal well-adjusted, well-mannered children" who have shown "no evidence of any emotional problems, and have appeared to be happy." The trial court found no change of circumstances warranting any change in the order relating to custody. The memorandum opinion of the trial judge shows that he took into consideration the wishes of the children, but concluded that the wishes of the children should be followed by the court only if the best welfare and interests of the children will be promoted by so doing; that the gratification of the wishes of the children is subordinate to their permanent well being as determined by the court from all of the evidence. This is undoubted law. The wishes of the parents, if opposed to that object, must yield to the welfare of the children. Lutker v. Lutker, Mo.App., 230 S.W.2d 177, 178; Meredith v. Krauthoff, 191 Mo.App. 149, 177 S.W. 1112, 1119. The wishes of the children, likewise, must yield to that paramount consideration. The happiness of the children, while an important consideration, is not the sole object to be accomplished in the determination of their welfare. Wells v. Wells, Mo.App., 117 S.W.2d 700. There is abundant testimony, however, that these children are not *314 in fact unhappy, but instead enjoy a happy and normal home life with their father and stepmother; and that they have expressed their wish to spend the major portion of their time with their mother in the east because they have been led to believe that their father has broken an agreement with their mother with respect to their custodyan agreement of which neither the trial court nor this court can find any satisfactory evidence. They know, from the lips of their mother, that her failure to secure their general custody at the 1948 hearing was a great blow and disappointment to her. The children are intensely loyal to their mother and love her very dearly. It is fairly to be inferred that because of this loyalty and love they have taken her side in this controversy, believing that she has been treated unfairly. There is this further consideration, namely, that all of their experiences in Massachusetts have been during vacation periods when there were no school lessons or routine homework to do and where in an atmosphere of leisure they have enjoyed outings on Naushon Island, boating, horseback riding, swimming, tree planting, picnicking and other vacation pleasure pursuits. Furthermore, a most attractive picture of what life would be like with their mother has been painted for them. She has described plans for a swimming pool, the "lovely" schools, and told Nancy, in response to her question whether she could have a car of her own when she is old enough to drive: "Wait until this is all settled and maybe we will all have cars. We can't have any while this contest is going on." She mentioned skiing, ice skating and sledding in Concord during the winter and reminded the children of the fun they could have on the "hundreds of acres of woods" owned by the Hosmers. The children would indeed be remarkable if after such pleasant past experiences and future possibilities, emphasized by a loving and doting mother through years of attention and love, they would not be persuaded that they would be happier in the vacation land atmosphere. In Wells v. Wells, supra, this court held that the expression of the preference of a 12 year old girl to be with one parent or the other given under the circumstances disclosed in that record would be a "very unreliable guide in determining to which of the parents her custody should be awarded." [117 S.W.2d 705.]
We have examined the cases from other jurisdictions cited by appellant, but in view of their very different factual situations we are not persuaded to recede from our view that this judgment must be affirmed. We find no substantial change of conditions established in this record. The fact that the children have grown older in and of itself is no sufficient change of condition to warrant a change in custody. That was a contingency to be normally expected and the change from childhood into adolescence is one which it is to be presumed the trial court took into consideration in making the original decree in the infancy of the children.
The record discloses that the Fordyce home is one in which the children have received understanding and loving care and attention, consideration and affection; where their social development has been attended to; their education very properly advanced; their natural desire for athletic activities satisfied; their moral life closely guarded; and their religious life attended to. It is a home of culture, refinement, intelligence and substance. There the children have been since the time of their birth, except for the comparatively short periods of time they have been with their mother. The proposed change would uproot their associations at home, in school, at church and with their circle of friends. It would subject them to new routines and different standards of discipline. It would place Nancy in a different school during her senior year in high school. At Cam's age he needs a father's guiding hand and directing influence. Lutker v. Lutker, supra; Meredith v. Krauthoff, supra; Baer v. Baer, Mo.App., 51 S.W.2d 873, loc. cit. 879.
No useful purpose could be served by thus interfering with the course of their development at this stage of their careers. The trial court very wisely determined that the present arrangement continue whereby *315 these children, fortunate in one sense of the word in that they have two homes, may continue to spend their school periods with their father and their vacation periods with their mother. Far from being a "manifest abuse of discretion" the judgment of the trial court exhibits a keen insight into their best welfare. Any other decision would have been at best experimental. Experiments with a trust of this nature should not be indulged. Irvine v. Aust, Mo.App., 193 S.W.2d 336.
It is the recommendation of the Commissioner that the judgment of the trial court be affirmed.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the trial court is, accordingly, affirmed.
ANDERSON, P. J., and McCULLEN and BENNICK, JJ., concur.