WOODALL, Justice.
Rachel Sanders Cochran appeals from orders of the Montgomery Circuit Court modifying a previous award of custody of the two minor children of her former marriage with Gregory Donald Cochran. We reverse and remand.

I. Procedural Background

The couple was divorced on February 22, 2001. The marriage produced two children, namely, W.G., born in 1995, and S.S., born in 1998. The judgment of divorce incorporated a settlement agreement executed by the couple, which vested joint legal custody of the children in Mr. Cochran and Mrs. Cochran, with physical custo *1223 dy in Mrs. Cochran. The award of physical custody to Mrs. Cochran was subject to Mr. Cochran’s “reasonable visitation” with the children, pursuant to a detailed visitation schedule. Specifically, the children were to be with Mr. Cochran every other weekend from 4:00 p.m. on Friday to 4:00 p.m. on Sunday. They were also to spend “two separate weeks” with him each summer during June, July, or August, the weeks to be designated by mutual agreement. In the absence of an agreement, the judgment provided that Mr. Cochran was to have the children during the “second full week of June and the third full week of July.” It also provided that Mr. Cochran would have the children on Father’s Day; for spring school holidays during even-numbered years; for Easter during odd-numbered years; for designated hours on Christmas and Thanksgiving; and “any other times mutually agreed upon by the parties.” (Emphasis added.)
Paragraph 8(d) of the settlement agreement provided:
“For the month following the month during which the youngest minor child begins first grade (or K-5 if such K-5 program is a full day program) and is no longer in need of childcare services, husband’s child support payments shall be reduced by $500.00 of the amount then required to be made as child support.”
The judgment gave Mrs. Cochran “final authority” in matters involving the health, education, and welfare of the children.
Mr. Cochran subsequently defaulted on child support and other payments required of him under the divorce judgment. Consequently, Judge Richard H. Dorrough entered arrearage judgments against him in September 2002 and in January 2003, in the amounts of $18,752.60 and $2,142.70, respectively.
Meanwhile, from February 2001 until at least August 2004, Mr. Cochran enjoyed access to the children in addition to the visitation specifically allowed by the settlement agreement. For example, he routinely kept the children for two hours after school every Tuesday and Thursday (hereinafter referred to as “the weekday visits”). By approximately August 2004, however, Mrs. Cochran was no longer consenting to the weekday visits, and, on April 28, 2005, Mr. Cochran filed a “petition for modification of custody or alternatively petition for modification of visitation.” The petition sought an order awarding Mr. Cochran primary physical custody or, alternatively, at least one-half the custodial period. The petition also sought a “formal parenting plan” awarding Mr. Cochran the “final decision-making authority with regard to the children’s education, emotional, and physical health issues, and extracurricular and sports activities.”
On July 13, 2005, pursuant to a joint motion filed by the Cochrans, the trial court appointed Dr. Karl Kirkland as a “parenting coordinator” to assist the Coch-rans in “making and implementing decisions ... regarding visitation matters.” On August 30, 2005, Mr. Cochran filed a motion to dismiss his petition for modification on the ground that the “best interests of the ... children [would be] served by ... the parties’ continuing participation in co-parenting counseling with Dr. Kirkland.” The trial court granted that motion.
*1224 However, on September 26, 2006, Mr. Cochran filed a second “petition for modification,” alleging that there had “been a material change in circumstances since the entry of the previous award of custody and visitation.” He sought a reallocation of the “rights and responsibilities between the parties with regard to the parties’ minor children to include more of a shared parenting time” and an order giving him “the final decision-making authority with regard to the children’s education, emotional, and physical health issues, and extracurricular and sports activities.” On February 23, 2007, Mr. Cochran filed a sworn amended petition for - modification, seeking an order awarding him “true joint custody of the children and designating him] as having final decision-making authority with regard to the children’s medical care, their education, and their sports activities.”
On August 16, 2007, after an ore tenus hearing, the trial court entered an order (hereinafter referred to as the “modification order”) that, among other things, awarded the parties joint legal and physical custody and gave Mr. Cochran final decision-making authority as to the children’s health care, education, and extracurricular activities, based on a finding of a material change in circumstances. The court’s rationale related in large part to three matters that, according to Mr. Cochran, amounted to material changes in circumstances since the entry of the divorce judgment. One was that, from November 2004 to approximately November 2006, W.G. had been treated with the antidepressant drug Prozac. Although the treatment had ended by February 23, 2007, when Mr. Cochran filed his amended petition, he asserted that the course of treatment for W.G. evidenced, among other things, bad judgment on Mrs. Cochran’s part. Second, he asserted that Mrs. Cochran had undermined his relationship with the children by terminating the weekday visits. Third, Mr. Cochran alleged that, because the children had grown older since the divorce, they needed to spend more time with him.
In the modification order, the trial court stated, in pertinent part:
“[Mr. Cochran] adamantly objected to learning that his older son, W.G., was prescribed Prozac at [Mrs. Cochran’s] request. The circumstances of [Mrs. Cochran’s] obtaining that prescription for Prozac for this child were murky at best. What was clear was that the child was not taken to a physician prior to the prescription being written. Testimony appeared to indicate that [Mrs. Cochran] simply called the child’s doctor and requested a prescription for Prozac to cure W.G.’s behavior problems at school. [Mr. Cochran] objects to the children being placed on medication prior to exhausting other remedies for whatever the behavioral problem may be. He appeared gravely concerned that such action by [Mrs. Cochran] would occur again. [Mr. Cochran] further objects to [Mrs. Cochran’s] continued exclusion of him from major decisions about the children. He believes that her decision to unilaterally allow W.G. to take Prozac and to continue that medication after the physician recommended stopping the medication, is not in the child’s best interest and does not evidence sound judgment.
“The court believes circumstances have materially changed since the entry of the final decree of divorce such that the two young children would benefit from increased direct paternal guidance at this crucial stage in their lives. For example, the older child, W.G., was suspended for two days from school because he and other children wrote an inappropriate message at school. When *1225 W.G. further manifested his reluctance or refusal to comply with behavioral requirements of a child of his age, the result was the prescription for Prozac. There was testimony from several witnesses that both children are frequently belligerent toward [Mrs. Cochran] and that, on occasion, she has called [Mr. Cochran] to assist in controlling the behavior problems. There was testimony that the children had hit [Mrs. Cochran] on occasion and that they speak to her in a disrespectful manner.
“[Mrs. Cochran’s] testimony confirmed that she believes that it is within her purview, as the physical custodian for the children, to determine whether or not the children should exercise visitation with their father. At some point after the divorce, the parties agreed that, in addition to scheduled visitation, [Mr. Cochran] would have visitation on Tuesdays and Thursdays each week. However, [Mrs. Cochran] only allowed him to pick up the children at about 4:00 p.m. and to return them to her home between 6:00 p.m. and 6:30 p.m. She unrealistically expected that the children would complete their homework and eat supper during this time. Upon returning the children to her home, [Mr. Cochran] testified that he was often greeted by a baby-sitter waiting to care for them because [Mrs. Cochran] was ‘out’ for the evening.
“On or about August of 2004, [Mrs. Cochran] unilaterally stopped the weekday visitation. [Mr. Cochran] asserts that the cessation of visitation was because he refused to reimburse her for a fence she built at her home. [Mrs. Cochran] asserted that she stopped the visitation because [Mr. Cochran] was unable to fulfill the requirements of a father helping the children with elementary school homework. Given the level of intelligence and post-secondary education of these parties, [Mrs. Cochran’s] rationale is nothing more than an attempt to disguise interference with [Mr. Cochran’s] visitation and, therefore, his long-term relationship with his children.”
In a separate order issued the same day (hereinafter referred to as the “co-parenting order”), the court vested in Dr. Kirkland the ultimate authority to, among other things, “changfe] education, daycare, and/or extra-curricular activities for the children,” and to “determin[e] appropriate medical, mental health and counseling treatment (including psychotherapy, domestic violence counseling and batterers’ prevention programs, substance abuse treatment or counseling and parenting or co-parenting classes) for the parents and/or the children.”
In the modification order, the court also declared, void the arrearage judgments of 2002 and 2003. Specifically, as to the ar-rearage judgments, the order stated:
“That pursuant to the parties’ original 2000 Settlement Agreement, [Mr. Cochran’s] child support obligation was to be decreased by $500.00 per month for the month following the youngest child’s enrollment in first grade or K-5 (September 2004). Said child support amount was never decreased and [Mr. Cochran] has continued to pay $500.00 over and above what was reflected by the agreement for some 36 months (September 2004-August 2007). Therefore, [Mr. Cochran] is due to receive a credit of $18,000 against any remaining amounts owed to [Mrs. Cochran]. It appears such a credit would more than satisfy the 2002 and 2003 judgments for monies owed to [Mrs. Cochran] for arrearages. (The court did not add the amounts of [Mr. Cochran’s] payments since 2002 which were in excess of [Mr. Cochran’s] monthly child support amount. It ap *1226 pears that such an undertaking would yield a large over-payment to be credited to [Mr. Cochran].) Therefore, as of the date of this order, all arrearages and judgments against [Mr. Cochran] are deemed fully satisfied and the judgments are void. Neither party shall owe the other any monies other than what is specifically addressed in this order and/or not specifically modified herein.”
(Emphasis added.)
Mrs. Cochran appealed, requesting that the modification order and the co-parenting order be reversed in toto. Thereafter, all five judges on the Court of Civil Appeals recused themselves,[1] and the appeal was transferred to this Court, pursuant to Ala.Code 1975, § 12-3-15.

II. Standard of Review

The parties agree in this Court — as they did in the trial court — that the applicable standard is the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984).
“In situations in which the parents have joint legal custody, but a previous judicial determination has granted primary physical custody to one parent, the other parent, in order to obtain a change in custody, must meet the burden set out in Ex parte McLendon. See Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ. App.1995). The burden set out in McLendon requires the parent seeking a custody change to demonstrate that a material change in circumstances has occurred since the previous judgment, that the child’s best interests will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody. Ex parte McLendon, 455 So.2d at 866.”
Dean v. Dean, 998 So.2d 1060, 1064-65 (Ala.Civ.App.2008).
“A material change of circumstances occurs when important facts unknown at the time of the initial custody judgment arise that impact the welfare of the child. A custodial parent’s change of environment that endangers the child’s physical or emotional health, safety, or well-being constitutes a material change of circumstances.” K.E.W. v. T.W.E., 990 So.2d 375, 380 (Ala.Civ.App.2007) (citation omitted). “The McLendon standard is a ‘rule of repose,’ meant to minimize disruptive changes of custody because this Court presumes that stability is inherently more beneficial to a child than disruption.” Ex parte Cleghorn, 993 So.2d 462, 468 (Ala.2008).
“On appellate review of custody matters, [the appellate] court is limited when the evidence was presented ore tenus, and, in such circumstances, a trial court’s determination will not be disturbed ‘absent an abuse of discretion or where it is shown to be plainly and palpably wrong.’ Alexander v. Alexander, 625 So.2d 433, 434 (Ala.Civ.App.1993) (citing Benton v. Benton, [520 So.2d 534 (Ala.Civ.App. 1988) ]). As the Alabama Supreme Court highlighted in [Ex parte] Patronas, [693 So.2d 473 (Ala.1997) ], ‘ “[T]he trial court, is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.” ’ Patronas, 693 So.2d at 474 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996)). Thus, ap *1227 pellate review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence to support the trial court’s judgment. See Patronas, 693 So.2d at 475.
“ ‘However, even under the ore tenus rule, “[wjhere the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.’” B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979)).”
Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala. Civ.App.2007). Moreover, the ore tenus rule does not apply to a trial court’s legal conclusions. Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000).

III. Discussion

Mrs. Cochran contends that the conclusions underpinning the modification order and the co-parenting order are legally and factually insufficient. In particular, she challenges the modification order inasmuch as it modified the custody arrangement set out in the judgment of divorce. She also argues that the modification order “erroneously voided vested arrearage and cost judgments previously awarded to [her] for [Mr. Cochran’s] failure to abide by the final judgment of divorce.” Mrs. Cochran’s brief, at 67 (emphasis added).

A. Modification of the Custody Arrangement

As noted previously in this opinion, Mr. Cochran’s arguments for modification of the custody arrangement principally involved the prescription for Prozac for the older son and Mrs. Cochran’s alleged interference with Mr. Cochran’s parental relationship with the children.

(1) The Prozac Prescription

The trial court concluded that Mrs. Cochran essentially commandeered a prescription for Prozac as a treatment for W.G. and that she did so precipitously. This conclusion is without factual support. Mrs. Cochran’s first recourse for treatment of W.G. was Dr. JoAnne W. Ray, a licensed clinical psychologist. Dr. Ray was W.G.’s longtime therapist, having provided “therapeutic services” to W.G. soon after the couple’s divorce in 2001 for “symptoms of mood disturbance and defiant behavior.” At another time, Dr. Ray “performed [a] kindergarten evaluation” of W.G. in connection with his enrollment at a private school. In August 2004, Mrs. Cochran had again engaged the services of Dr. Ray for treatment of anxiety and moodiness that W.G. was experiencing. Indeed, Mr. Cochran had, several months earlier, recommended to Mrs. Cochran that she seek counseling for W.G. Both Mr. Cochran and Mrs. Cochran participated in W.G.’s sessions with Dr. Ray.
Those counseling sessions continued until mid-November 2004. By that time, Dr. Ray had become dissatisfied with the progress of the sessions, and, according to Mrs. Cochran, she recommended that W.G. “be evaluated by a psychiatrist for possible medication.”[2] She gave Mrs. Cochran the names of the only two psychiatrists in Alabama whom she would recommend. However, Mrs. Cochran was unable to locate one of those doctors, and the other was not accepting any new patients. Mrs. Cochran then discussed Dr. Ray’s recommendation with Dr. Catherine L. Wood, a pediatrician at Partners in Pediatrics (hereinafter referred to as “the Partners”), *1228 who had been one of the primary physicians for the children since birth. After that discussion and throughout the next two years, Dr. Wood, as well as her associate, Dr. Susan A. Brannon, another of the children’s life-long primary physicians, prescribed Prozac for W.G. During that time, Mr. Cochran discussed the medication with Dr. Wood and Dr. Brannon. According to Mr. Cochran, he understood that the medication was to help the child “through a dark mood.”
The only basis for the trial court’s statement that Prozac was administered even “after the 'physician recommended stopping the medication” (emphasis added) appears to be an assertion in Mr. Cochran’s amended petition to that effect with reference to Dr. Wood. However, Mr. Cochran presented no testimony from Dr. Wood or from any other physician concerning W.G.’s taking of Prozac. Moreover, in his own trial testimony, Mr. Cochran agreed that “Dr. Wood and Dr. Brannon prescribed the Prozac until some point in late ... November 2006.” (Emphasis added.) The medication ceased in November 2006. In other words, the trial testimony directly refuted the allegation that Prozac was administered to W.G. after the prescribing physician recommended that it be stopped.
Neither does the record support the trial court’s assertion that an incident at school precipitated the prescription for Prozac. W.G. was suspended from classes for two days because of an inappropriate message he had drawn. However, according to Mr. Cochran’s brief, the incident at school occurred in December 2004. Mr. Cochran’s brief, at 14. It is clear from the record that the Prozac treatment began the preceding month. Thus, although Mr. Cochran allegedly disapproved of the course of treatment prescribed by the Partners, it is apparent that the course of treatment was the culmination of a methodical, regular, and responsible process.

(2) The Weekday Visits

The trial court characterized Mrs. Cochran’s decision to terminate the weekday visits as evidence of an attempt to undermine Mr. Cochran’s authority with the children. In that connection, the trial court stated: “[Mrs. Cochran’s] testimony confirmed that she believes that it is within her purview, as the physical custodian for the children, to determine whether or not the children should exercise visitation with their father.” Mrs. Cochran argues — and we agree — that her “pro-active stance in allowing Tuesday-Thursday and other additional visitation was [improperly] used as a weapon against her.” Mrs. Cochran’s brief, at 56.
Mrs. Cochran was not legally obligated to continue the weekday visits, which merely supplemented, by mutual agreement, the visitation schedule set out in the divorce judgment. It is the policy of the courts to encourage amicable agreements between the parties in custody matters, because such agreements benefit all the parties, and the children in particular. Ex parte Couch, 521 So.2d 987, 990 (Ala.1988). That policy would be frustrated if “agreed-upon changes to a custody arrangement [could] be considered to be relinquishment of a parity’s] rights under the previous custody judgment.” Watters v. Watters, 918 So.2d 913, 917 (Ala.Civ. App.2005).
At any rate, modification of custody is not the proper remedy for a visitation dispute. Foster v. Carden, 515 So.2d 1258, 1260 (Ala.Civ.App.1987); Smith v. Smith, 464 So.2d 97, 100 (Ala.Civ.App. 1984). “Rather, the appropriate remedy in such a situation is to punish the custodial parent for contempt, not to uproot the *1229 children.” Lami v. Lami, 564 So.2d 969, 970 (Ala.Civ.App.1989).
Mr. Cochran relies on Fricks v. Wood, 807 So.2d 561 (Ala.Civ.App.2001), in which the Court of Civil Appeals affirmed a judgment modifying custody in favor of the noncustodial parent on the ground that “the mother had deliberately obstructed the father’s relationship with the child.” 807 So.2d at 564. Mrs. Cochran contends that Fricks is easily distinguishable from this case, and we agree. In Fricks, the following factors were determinative:
“The mother admitted that on numerous occasions, she had denied the father his scheduled visitation because she was confused or had made a mistake in interpreting the parties’ divorce judgment; that she had prevented the father from picking the child up from his preschool program .... She admitted that she had purposely omitted the father’s name and his contact information from all of the child’s school enrollment forms, and that she had listed her new husband as the child’s father.”
807 So.2d at 563-64 (emphasis added). Additionally, she “did not even list the father as a person approved to pick up the child from school.” Id. at 562-63.
In this case, there are no allegations that Mrs. Cochran has violated the visitation schedule set out in the divorce judgment so that she would be subject to contempt proceedings. There is no authority in the settlement agreement — or anywhere else of which this Court is aware — for the proposition that a parent who has primary physical custody may not engage the services of someone other than the former spouse as an occasional babysitter.
Mr. Cochran concedes that he has always had complete access to the children’s school and medical records. Unlike the mother in Fricks, Mrs. Cochran made no attempt to hide the identity of the children’s father or to isolate Mr. Cochran from the personnel at the children’s school or from the school itself. Also, according to Mr. Cochran, he “had a lot of access to the boys along with the structured two-hour visits on Tuesdays and Thursdays.” (Emphasis added.) Mr. Cochran coaches a number of sports activities in which his children regularly participate. In that connection, he often drives the children to and from the sports events. At trial, he stated: “I have still a lot of access to the boys. It’s access during their sporting events. ... They are practicing football or practicing basketball during the time that I am with them.” (Emphasis added.) Fricks does not aid Mr. Cochran.
An issue involved in the termination of the weekday visits was homework. However, it was Mrs. Cochran’s position that the weekday visits were interfering with the children’s ability to complete their homework within, in the words of Dr. Kirkland, “the rigorous homework and structured schedule requirements associated with private school in Montgomery.”[3] There was never any allegation, as the trial court suggested, that Mr. Cochran was incapable of doing elementary-school homework. There was no evidence to support Mr. Cochran’s contention, or the trial court’s conclusion, that in terminating the weekday visits Mrs. Cochran was attempting to undermine his relationship with the children.
Finally, the mere passage of time is not a basis for a modification of custody. Nichols v. Nichols, 516 P.2d 732, 734 n. 3 (Alaska 1973). “ ‘The fact that the children have grown older in and of itself is no sufficient change of condition to warrant a change in custody.’ ” Engler v. *1230 Engler, 455 S.W.2d 36, 41 (Mo.Ct.App. 1970) (quoting Fordyce v. Fordyce, 242 S.W.2d 307, 314 (Mo.Ct.App.1951)). The natural aging process is a “contingency to be normally expected and ... is one which it is to be presumed the trial court took into consideration in making the original decree in the infancy of the children.” Fordyce, 242 S.W.2d at 314. Moreover, it is disingenuous to suggest that any alleged “belligeren[ce]” of the children toward Mrs. Cochran constitutes a ground for modifying the custody arrangement in favor of Mr. Cochran. See Pullum v. Webb, 669 So.2d 925, 927 (Ala.Civ.App.1995) (“erosion of the relationship between the [custodial parent] and the children is insufficient to support a change in custody”).
For these reasons, we conclude that Mr. Cochran has not met his burden of showing “that a material change in circumstances has occurred since the previous, judgment.” Dean, 998 So.2d at 1065. Because as to custody the modification order is without legal and factual support, it cannot be sustained. As to the custody issue, it is, therefore, reversed. Likewise, the co-parenting order, which is a product of the erroneous modification order, is also • reversed.

B. Credit on the Arrearage Judgments

Mrs. Cochran next contends that the trial court misconstrued paragraph 8(d) of the settlement agreement by erroneously concluding that the $500 childcare provision terminated in September 2004, the month after S.S. began first grade, and she argued that the trial court lacked the power to void the arrearage judgments of 2002 and 2003. Because we agree that the trial court was without jurisdiction to void the arrearage judgments, we do not decide whether it correctly identified the terminus ad guem of the childcare provision.
“It is well settled that child support payments become final judgments on the day they are due and may be collected as any other judgment is collected; and that payments that mature or become due before the filing of a petition to modify are not modifiable. See State ex rel. Howard v. Howard, 671 So.2d 83 (Ala.Civ.App.1995); Cunningham v. Cunningham, 641 So.2d 807 (Ala.Civ. App.1994); Glenn v. Glenn, 626 So.2d 638 (Ala.Civ.App.1993); Frasemer v. Frasemer, 578 So.2d 1346 (Ala.Civ.App. 1991); Barnes v. State ex rel. State of Virginia, 558 So.2d 948 (Ala.Civ.App. 1990); Endress v. Jones, 534 So.2d 307 (Ala.Civ.App.1988). Furthermore, it is well settled that a trial court has no power to forgive an accrued arrearage. See, State ex rel. McDaniel v. Miller, 659 So.2d 640 (Ala.Civ.App.1995); Hardy v. Hardy, 600 So.2d 1013 (Ala.Civ. App.1992), cert. denied, Ex parte Hardy, 600 So.2d 1016 (Ala.1992). Although the trial court has the discretion to give the obligated parent credit for money and gifts given to the child or for amounts expended while the child lived with the obligated parent or a third party, it may not discharge child support payments once they have matured and come due under the divorce judgment.”
Ex parte State ex rel. Lamon, 702 So.2d 449, 450-51 (Ala.1997) (emphasis added). See also McIlwain v. Atchison, 571 So.2d 1181, 1182 (Ala.Civ.App.1990) (distinguishing Keller v. Keller, 370 So.2d 306 (Ala.Civ. App.1979), and holding that “the trial court ... lacked the authority” to allow “the father credit against a [1986] arrearage judgment for sums paid by the father to support and maintain the child for periods of time [from 1986 to 1989] when the child did not reside with the mother”). Thus, to the extent that the modification order deemed the arrearage judgments “fully *1231 satisfied” and “void,” the order is reversed.[4]

TV. Conclusion

In conclusion, the modification order is reversed in toto, and the co-parenting order is likewise reversed. This case is remanded for the entry of an order or orders consistent with this opinion.
REVERSED AND REMANDED.
LYONS and BOLIN, JJ., concur.
PARKER, J., concurs in the result.
SEE and MURDOCK, JJ., concur in the judgment of reversal, but dissent as to the rationale and the instructions on remand.
COBB, C.J., and STUART, J., recuse themselves.

. At the time of her appeal, Mrs. Cochran was serving as a staff attorney for a judge on the Court of Civil Appeals.

. Mr. Cochran was not present when Dr. Ray made this recommendation.

. Letter of Dr. Kirkland to the trial court, dated September 13, 2006.

. The dissent cites Kuhn v. Kuhn, 706 So.2d 1275 (Ala.Civ.App.1997), and Rubrigi v. Rubrigi, 630 So.2d 67 (Ala.Civ.App.1993), in support of Mr. Cochran’s claim for a credit against the arrearage. Those cases are inap-posite, however, because they do not involve — as this one does — an order essentially reopening a prior arrearage judgment.