40 So.3d 736 (2009)
C.D.K.S.
v.
K.W.K.
2071115.
Court of Civil Appeals of Alabama.
December 18, 2009.
*737 Kelli F. McDaniel, Montgomery, for appellant.
Judy Harrison Barganier and Jamie Guy Ratliff of Law Offices of Judy H. Barganier, P.C., Montgomery, for appellee.
PER CURIAM.
C.D.K.S. ("the mother") appeals from a judgment modifying the provisions of a January 2002 divorce judgment by transferring custody of Jo.K. ("the child") to K.W.K. ("the father").
*738 The mother filed a petition to modify the parties' 2002 divorce judgment to obtain postminority support for Ja.K., another child of the mother who had been adopted by the father during the parties' marriage. The father responded by, among other things, filing a counterclaim seeking physical custody of the child, who had been born of the parties' marriage. After the parties resolved all the other issues between them, the trial court conducted an ore tenus hearing on July 26, 2007, on the father's counterclaim seeking custody of the child. Following that hearing, the trial court entered a 13-page order on July 31, 2007, containing numerous factual findings and concluding that custody of the child should be transferred to the father. However, rather than unconditionally awarding custody of the child to the father, the trial court stated in its order that it would transfer custody of the child to the father for "a trial period" and would review the case on December 20, 2007,
"for the purpose of determining whether or not academic progress has been achieved and whether or not [the child] is adjusting to life in [the] father's household. Subsequent to the hearing on December 20, the Court will enter a final Order in this matter."
The trial court further awarded the mother visitation with the child and ordered the mother to pay the father $800 a month in child support.
Both parties filed motions seeking a reconsideration and alteration of the July 31, 2007, order. At the parties' request, the trial court set those motions for a hearing on October 25, 2007. Before that hearing could take place, however, the mother filed an "Emergency Motion for Transfer of Custody" in which she alleged that custody of the child should be returned to her because the father had been arrested and charged with first-degree sodomy and first-degree sexual abuse arising out of acts the father allegedly had committed with a 20-year-old woman and, further, that the father had been terminated from his employment. The trial court conducted an abbreviated hearing on that motion on October 3, 2007. During that hearing, the trial court indicated that it had sealed the case file based on the mother's concern that the negative publicity surrounding the father would harm the child. The trial court also appointed a guardian ad litem to investigate the matter and to report his findings. The trial court subsequently entered an order canceling the scheduled October 25, 2007, hearing, indicating that all pending matters would be heard on December 20, 2007, unless the guardian ad litem moved for an earlier hearing, and stating its intention that the mother could regain custody of the child at that time only upon satisfaction of the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984).
The trial court later continued the December 20, 2007, hearing to February 14, 2008, and then continued the hearing again to April 3 and 4, 2008. On March 12, 2008, the trial court granted the father's motion to stay the custody proceedings. The trial court ordered that the stay would be in effect "pending the final outcome of the criminal charges pending against the [father] or the conclusion of the child's 2007-2008 school year, whichever is later." The trial court ordered the father's counsel to submit a report of the child's grades at the conclusion of the 2007-2008 school year and further ordered the guardian ad litem[1] to file a "preliminary report" containing *739 his recommendations as to the custody disposition.
On June 4, 2008, the father submitted the child's grades as ordered. On July 1, 2008, the guardian ad litem moved the court to set a status hearing. On July 3, 2008, the guardian ad litem submitted to the trial court a report containing his custody recommendations. In that report, the guardian ad litem noted that the child had made all A's and B's at Pelham High School during the past semester and that the child was doing well in counseling with Dr. Henry Paine, who had opined that the best interests of the child would be served by continuing placement with the father in Helena. The guardian ad litem also indicated that he had consulted with the child, who had indicated that he was "fine" in his current living situation. Although the guardian ad litem expressed concerns regarding the attention the child might be subjected to because of the father's then-upcoming criminal trial, the guardian ad litem ultimately recommended that the child stay with the father, deferring to the statement of the child and the opinion of Dr. Paine.
On July 18, 2008, the mother filed a motion to finalize the temporary order so that it could be appealed. On July 29, 2008, the trial court entered a judgment determining from the report of the guardian ad litem that the child was doing well in the custody of the father. The trial court opined in its judgment that no further proceedings were necessary, and it granted the mother's motion, making the July 31, 2007, order its final judgment awarding custody to the father.
The mother timely appealed from the July 29, 2008, judgment. On appeal, the mother argues (1) that multiple findings of fact contained in the July 31, 2007, order, which the trial court made final on July 29, 2008, are plainly and palpably wrong, (2) that the father did not present sufficient evidence to meet the standard set forth in Ex parte McLendon, supra, (3) that the trial court failed to state any compelling reasons for separating the child from his brother, (4) that the trial court erred in calculating the amount of child support awarded to the father, (5) that the trial court erred in requiring the mother to meet the Ex parte McLendon standard in order to regain custody of the child, and (6) that the trial court erred in sealing the court file.
We address the mother's arguments relating to the custody modification first. The parties agree that the parties' 2002 divorce judgment awarded them joint legal custody of the child and awarded the mother primary physical custody of the child.[2]
"In situations in which the parents have joint legal custody, but a previous judicial determination has granted primary physical custody to one parent, the other parent, in order to obtain a change in custody, must meet the burden set out in Ex parte McLendon[, 455 So.2d 863 (Ala.1984) ]. See Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ.App.1995). The burden set out in McLendon requires the parent seeking a custody change to demonstrate that a material change in circumstances has occurred since the previous judgment, that the child's best interests will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody. Ex parte McLendon, 455 So.2d at 866."
*740 Dean v. Dean, 998 So.2d 1060, 1064-65 (Ala.Civ.App.2008).
In order to prove a material change of circumstances, the noncustodial parent must present sufficient evidence indicating (1) that there has been a change in the circumstances existing at the time of the original custody judgment or that facts have been revealed that were unknown at the time of that judgment, see Stephens v. Stephens, 47 Ala.App. 396, 399, 255 So.2d 338, 340-41 (Civ.App.1971), and (2) that the change in circumstances is such as to affect the welfare and best interests of the child. Ford v. Ford, 293 Ala. 743, 310 So.2d 234 (1975). The noncustodial parent does not have to prove that the change in circumstances has adversely affected the welfare of the child, but he or she may satisfy the first element of the McLendon test by proving that the change in circumstances materially promotes the best interests of the child. Id.
At trial, the father testified that, since the entry of the parties' 2002 divorce judgment, the circumstances had "drastically" changed. According to the father, the child was "failing in his core subjects," the child had experienced a weight gain with associated health and hygiene issues, the mother had assumed a negative parenting style, the mother had interfered with the father's visitation, and the child had expressed a preference to reside with the father and to attend Pelham High School. The trial court's extensive findings of fact generally support all the father's assertions except the contention regarding the mother's parenting style. Based on those findings, the trial court concluded that a "material change in circumstances has occurred which necessitates a change in physical custody of [the child] to [the father]."
The mother first argues that the trial court erred in making many of its factual determinations regarding the academic achievement of the child and in concluding that the child's academic record constituted a material change in circumstances. We first consider the evidence relating to the academic performance of the child.
The mother testified without contradiction that, before the entry of the 2002 divorce judgment, she and the father had agreed to hold the child back for an extra year of kindergarten because of the child's special learning needs. The mother further testified, again without dispute, that, before the entry of the 2002 divorce judgment, the child had been tested by a clinical psychologist and that the psychologist had diagnosed the child with "Attention Deficit Disorder with a tendency toward dyslexia. When I say dyslexia, not reading backwards, but the part where he has comprehension problems." The child could not recall that testing, but he testified in response to the trial court's questioning that his eyes had been examined when he was 11 years old and that his vision was "okay."
At some point after the divorce while the child was still in elementary school, the mother transferred the child from the school he had been attending to a less expensive private school. After nine weeks at the new school, the mother was informed that the child was in danger of failing a grade because of his poor math scores. After consulting with A.K., the child's paternal grandmother who had once served as an elementary-school principal, the mother arranged for the child to return to his old school under a plan designed to compensate for his learning disability. In the first semester of his eighth-grade year, however, the child started off with what the mother termed "horrible grades." The school's guidance counselor and the mother attempted to help the child, but he managed only to raise his *741 grades to a 1.0 grade-point average by the end of that semester. Based on the advice of the school's guidance counselor, who testified at trial, the mother searched for a "regular pace" school in central and southern Alabama before deciding to place the child in Evangel Christian Academy ("Evangel").
The child completed the eighth grade at Evangel; he achieved a 2.2857 grade-point average, but he failed pre-algebra. The child continued at Evangel for his ninth-grade year; he earned a 2.4286 grade-point average at the end of the first semester and a 2.2857 grade-point average at the end of the second semester, for a yearly grade-point average of 2.3571. Although the mother employed a tutor for the child in the second semester of the ninth grade, the child failed "Algebra I," necessitating his attending summer school.
In its 2007 order, the trial court first stated:
"The [mother] consistently asserted that [the child] has Attention Deficit Disorder with a tendency to Dyslexia. Confusingly, she explained that the dyslexia was not related to comprehension."
(Emphasis added.) That finding contradicts the mother's testimony that the dyslexia affects the child's comprehension. The trial court then stated:
"No documents were produced or admitted into evidence which would document any bona fide diagnosis by a physician, psychiatrist or clinical psychologist such as would support the [mother's] assertion. Nevertheless, it is clear that [the child] struggles with some form of learning disability. The Court is troubled that no educational testing has been done for this child and, further, that no psychological or other allied testing has been done to determine the nature of any such learning disability, together with recommendations for connecting or managing the learning disability. In addition, [the child] has not undergone a comprehensive eye examination by an ophthalmologist to determine whether or not vision problems are related to his lack of academic success. The [mother] continues to rely on information several years old which she supposedly obtained from Dr. Rosemary Wool Jones, a respected clinical psychologist in Montgomery. As previously stated, no documents were offered into evidence to support the [mother's] assertion of an [attention-deficit-disorder] diagnosis."
Apparently from the use of the word "supposedly," the trial court discredited the mother's testimony that she had had the child evaluated and diagnosed by Dr. Jones. However, Edwina Cameron, the father's cousin and a long-time school guidance counselor, testified as a witness for the father. Cameron testified that Dr. Jones had, indeed, tested the child. The father did not dispute that such testing had taken place. It is true that the mother did not offer into evidence any documentation supporting the child's attention-deficit-disorder ("ADD") diagnosis; however, the record shows that medical doctors had prescribed the child medication for ADD. Moreover, the father did not dispute that the child has ADD; he merely explained that he believed there is a difference between having ADD and being learning disabled. The record also indicates that the child had passed a vision examination, and no one presented any evidence suggesting that the child's learning problems may be vision-related. In fact, the only mention in the record of the child's vision results from the trial court's questioning of the child on that subject.
The trial court also stated in its 2007 order:

*742 "The [father] entered into evidence [father's] Exhibit # 14 which documents [the child's] grades from [Evangel] for school year 2006-2007. The report lists [the child's] academic GPA at 2.3571, which includes grades for History, Physical Science, English, Algebra I, Art, PE and Bible. The [father] pointed out that if you remove Art, PE and Bible, leaving only the core subjects, [the child's] average in his core subjects is a 0.25. The [father] asserted that these grades in the core subjects were deplorable and clearly the child needs assistance other than simply hiring a tutor. The [father] stated that he did not believe that `making progress' could be defined as bringing up an algebra grade from a failing grade of 30 to a failing grade of 50."
Actually, the father did not testify at any point that the child had had a .25 grade-point average in his core subjects in the 2006-2007 school year. During questioning of a witness, the father's attorney asked if the witness was aware that the child had had a .25 grade-point average in his core subjects. However, the witness stated that he was not aware of that alleged fact. The child's grade reports reflect that, when considering only classes other than art, Bible Study, and physical education, the child carried a 1.67 grade-point average in his core subjects. Also, in his testimony, the father did not characterize the child's grades in his core subjects as "deplorable" or state that the child was not "making progress" by pulling up a failing grade of 30 in algebra to a failing grade of 50 in algebra. The father merely indicated that he felt the child could improve his grades in his core subjects and that tutoring had not enabled the child to pass algebra. The record contains no evidence that the child ever scored in the 30's in algebra.
The trial court further stated that "[i]t is undisputed that [the child] . . . is less than successful academically" and that "[t]here is no doubt that the [mother] has worked very hard in an effort to assure academic success for [the child], unfortunately, despite any efforts by the [mother], [the child's] grades from [Evangel] indicate that the child is failing."[3]
The mother actually disputed the father's contention that the child was not academically successful. The mother testified that the child had struggled at times because of his ADD but that he had "shined" since transferring to Evangel. The child's transcript from Envangel for the 2006-07 school year does not indicate that the child failed any subject other than Algebra I. Although the father testified that the child had had an "F" in some other unidentified core subject, the transcript contradicts that assertion. It appears from its findings that the trial court was convinced that the child was performing more poorly in school than the evidence proved.
Even if the record did show the level of academic failure that the trial court portrays in its order, that academic failure would not necessarily prove that a material change of circumstance has occurred. In Brooks v. Brooks, 991 So.2d 293 (Ala.Civ. *743 App.2008), this court held that a child's poor academic performance may be considered a material change in circumstances only if that poor performance arose after the entry of the original judgment. Obviously, if the child was experiencing learning difficulties at the time the original custody judgment was entered and the trial court knew of those problems and accounted for them in its custody judgment, a mere continuation of those problems will not be considered a change in circumstances.
In this case, the father did not present any evidence regarding the academic performance of the child at the time of the entry of the 2002 divorce judgment. The only evidence in the record on that point indicates that the child had been "left back" in kindergarten because of his special learning needs. In addition, the parties agree that in the 2002 divorce judgment, entered when the child was 10 years old, the trial court specifically found that the child suffered from a learning disability that necessitated the use of tutors whose cost would be borne equally by the parents. In 2002, the trial court obviously was aware of the child's learning problem when it decided that the best interests of the child would be served by being placed in the physical custody of the mother. Consistent with Brooks, we hold that the trial court erred by considering the continued learning problems of the child to be a material change in circumstance warranting a change of custody. That error led the trial court essentially to retry the issue of which parent would best be suited to address the educational needs of the childan issue already decided in favor of the mother in the parties' 2002 divorce judgment.
The mother next argues that the trial court erred in its findings regarding the wishes of the child. A trial court must consider the wishes of a child in determining whether a material change in circumstances has occurred. See Sherrod v. Sherrod, 361 So.2d 17 (Ala.Civ.App.1978). In its 2007 order, the trial court found that, during the trial, the child had made a "forthright statement that he wishes to reside with the father." Upon questioning by the trial court, the child testified at trial that he "kind of" wanted to live with the father. However, the child subsequently testified during the same line of questioning as follows:
"THE COURT: And you want to give living with your dad a try?
"[THE CHILD]: Yes. I mean, like really if I had to choose, I would choose to go live in Troy with my grandmother because then it wouldn't bethey wouldn'tthey wouldn't be fighting over who I stay with. And, I mean, I could do the thing where I see her one week and him the other week."
During the trial, the trial court actually acknowledged that the child had expressed a preference to live with his paternal grandmother. Nevertheless, the trial court, without any evidentiary basis, found that "apparently [the child] has told anyone who would listen that he wants to live with [the father]."[4]
Pursuant to the ore tenus rule, a trial court's findings of fact following a trial at which oral testimony is taken are presumed to be correct. However, an appellate court can reverse a judgment based on findings that are plainly and palpably wrong, clearly erroneous, or against the *744 great weight of the evidence. See Friedman v. Friedman, 971 So.2d 23, 28 (Ala. 2007). In this case, the trial court cited the child's wishes as one of its primary considerations for transferring custody of the child to the father. Because the trial court's finding as to the child's testimony is not supported by the evidence, the judgment, based in large part on that finding, is due to be reversed.
The mother next argues that the trial court erred in relying on unsubstantiated visitation problems to find a material change in circumstances. In its 2007 order, the trial court cited evidence that the mother had "consistently" interfered with the visitation of the father "throughout the years." To illustrate that point, the trial court referred to exhibits showing plans made by the mother for the child that fell on the weekends of the father's visitation. With only a few exceptions, those exhibits bear out the mother's testimony that she was merely notifying the father of upcoming social events coinciding with the father's weekend visitation and requesting the father to arrange for the child to attend those events. Those events, which included dances, parties, and dinners hosted by others, obviously were not scheduled specifically to interfere with the father's visitation. In one instance, the mother notified the father that the child wanted to stay home for a scheduled visitation weekend in order to set up his room in their new home. On another occasion, the mother notified the father that her vacation schedule conflicted with his scheduled visitation. In both instances, the mother requested or offered to rearrange the visitation schedule to assure the father did not lose time with the child.
The trial court also referred to an exhibit in which the mother supposedly unilaterally changed and denied the father visitation on Wednesday nights. That exhibit, dated November 4, 2003, states, in pertinent part:
"Until [the child and his brother's] grades improve we need to take the school night sleepovers on a week by week basis depending on the homework, special projects, extra curricular activities and test schedules. This was the recommendation of all three of [the child's] teachers. . . . You are welcome to get the kids on extra weekends, if you want, or on some school holidays to make up the time you've missed. It's up to you."
The parties agree that the 2002 divorce judgment did not provide the father with any midweek visitation.
In addition, the trial court criticized the mother for notifying the father on May 16, 2006, that she would agree to let the child reside with the father for a "trial period"[5] from June 1, 2006, through July 9, 2006. The trial court stated:
"The [father] is a 26-year veteran of the Department of Public Safety and, as such, has assignments that are scheduled that cannot easily be changed. His wife . . . is an employee of the Federal Bureau of Investigation. And although there was no testimony from her, it is logical that she too would have assignments that could not be dropped or changed with a two-week notice. While the [mother] appears to be willing to *745 send [the child] to live with his father, in actuality, the plan as established by the [mother] was set up to fail. (See [the father's] Exhibit # 29)."
The father testified that he had rejected the mother's offer because he was going out of town during that period, not because of a conflicting work schedule. As the trial court itself noted, the record contains no evidence indicating that the father's wife could not comply with the mother's suggested visitation schedule because of employment obligations. Furthermore, the record does not contain an "Exhibit 29" introduced by the father. The trial court also noted that the father had taken steps to enroll the child in summer school in Pelham in 2007 but that the mother had "refused to allow the child to reside with [the] father during the summer," instead enrolling the child in a private tutoring organization in Montgomery. The parties agree that the 2002 divorce judgment provided the father only two two-week periods of visitation during the summer.
To the extent the trial court found that the denial of visitation beyond that established in the parties' 2002 divorce judgment amounted to a material change in circumstances, the trial court erred as a matter of law. Our supreme court recently decided that a custodial parent is under no legal obligation to continue voluntary supplemental visitation and that the termination of such visitation does not constitute sufficient grounds to transfer custody of a child. See Cochran v. Cochran, 5 So.3d 1220, 1228-29 (Ala.2008). To the extent the trial court concluded that the mother's alleged interference with the court-ordered visitation schedule amounted to a material change in circumstances, the trial court also erred as a matter of law. In Cochran, supra, the supreme court held that modification of custody is not a proper remedy to resolve simple visitation disputes. Cochran, 5 So.3d at 1228 (citing Foster v. Carden, 515 So.2d 1258, 1260 (Ala.Civ.App. 1987), and Smith v. Smith, 464 So.2d 97, 100 (Ala.Civ.App.1984)).
The mother next argues that the trial court erroneously relied on the child's alleged health and hygiene problems in transferring custody of the child. In its judgment, the trial court indicated that the father contended that the child had "gained approximately 50 pounds within a year's time, ha[d] developed high blood pressure directly related to the weight gain, and there are hygiene issues. . . ." The trial court also stated: "Other health issues were a lack of cleanliness. The [father] was concerned about unclean fingernails and toenails, grooming and that the child needed to see a dentist and/or an orthodontist." The father testified that the child had gained approximately 50 pounds over "a couple of years," not one year, as the trial court stated. However, the record supports the other findings of the trial court on these issues. The child did develop elevated blood pressure in the fall of 2006, and some evidence, including the mother's own testimony summarizing the opinion of the child's pediatrician, indicates that the child's weight had contributed to that problem. The trial court did specifically find that the child's blood-pressure problem had been "rectified," but it also found, in accordance with the testimony of the father, that, because of the child's body type, his weight should be monitored and reduced to avoid future health problems. The mother disputes that the child, who regularly took two showers per day, was unclean, but the father did testify as set out in the trial court's findings.
However, we cannot affirm the judgment based on the accuracy of the trial court's findings regarding the child's health and hygiene problems. In its judgment, *746 the trial court indicated that it had relied not only on those factors, but also on the child's academic performance, the child's wishes, and the visitation disputes in deciding to transfer custody of the child to the father.[6] Based on our review of the record, we conclude that the trial court erred in considering the child's academic performance and the visitation disputes as material changes in circumstances justifying a change of custody, and we, therefore, reverse the trial court's judgment. We also reverse the judgment because it is based on clearly erroneous findings regarding the wishes of the child.
Because we cannot conclude that the trial court would have reached the same decision absent the errors of law and of fact outlined in our opinion, we remand the case to the trial court for it to reconsider its judgment in light of our opinion. On remand, the trial court is not to consider any evidence of the child's circumstances following the transfer of custody in July 2007 because, when the trial court transferred custody to the father in July 2007, it did so essentially on a pendente lite basis for a "trial period."[7]See Barber v. Moore, 897 So.2d 1150 (Ala.Civ.App.2004) (treating similar judgment as a pendente lite order); but compare Rich v. Rich, 887 So.2d 289 (Ala.Civ.App.2004) (plurality decision) (treating a similar judgment as a final judgment). In Barber, the lower court awarded Mr. Moore custody of two children from his marriage to his former wife. However, the lower court indicated that the award of custody would last only 100 days after which a review hearing would be conducted to determine if the custody determination should be made final. At the conclusion of the 100 days, the lower court determined that Mr. Moore should have custody of the children based, in part, on evidence of how the pendente lite custody arrangement had worked. 897 So.2d at 1154-55. This court held that the lower court had erred in considering evidence relating to the 100 days the children had been in the pendente lite custody of Mr. Moore. 897 So.2d at 1155. Consistent with Barber, the trial court in the present case is precluded from deciding whether the McLendon standard has been satisfied based on evidence related to the period following the entry of the July 2007 order.
Our reversal of the judgment of the trial court regarding custody of the child moots the issues relating to the separation of the siblings and the application of the McLendon standard to the mother's emergency motion. The reversal also requires the trial court to vacate its award of child support; therefore, we pretermit any discussion of those issues. As for the order sealing the case file, we note that the mother did not object to that action at the *747 time the order was entered, and, therefore, she has not preserved that issue for review. See Lollar v. Lollar, 991 So.2d 758, 760 (Ala.Civ.App.2008); see also Somers v. McCoy, 777 So.2d 141, 143 (Ala.Civ.App. 2000) ("This court may not consider any issue raised for the first time on appeal.").
Both parties' requests for the award of attorney's fees on appeal are denied.
REVERSED AND REMANDED.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.
PITTMAN, J., dissents, with writing.
PITTMAN, Judge, dissenting.
Because I believe the majority opinion impermissibly reweighs the evidence in this case, in derogation of Ex parte Patronas, 693 So.2d 473, 474-75 (Ala. 1997), and Ex parte Bryowsky, 676 So.2d 1322, 1324-26 (Ala.1996), I must respectfully dissent. I believe the testimony regarding the child's increasing academic struggles, the child's early-onset blood-pressure and weight-control issues, and the child's request to "try" living somewhere else than with his mother constitutes sufficient evidence to support the trial court's judgment; therefore, I would affirm the trial court's judgment.
NOTES
[1] The trial court appointed a new guardian ad litem in January 2008 following the incapacity of the original guardian ad litem, who had been seriously injured in a motorcycle accident.
[2] The divorce judgment is not part of the record.
[3] The trial court further found:

"The [mother] and her current husband, [K.S.], both testified that they had investigated some 10 high schools for possible placement of [the child] prior to selecting [Evangel]. They visited schools in Lee County and as far south as Fairhope in Baldwin County and Mobile schools."
Actually, the father testified that when the child was experiencing problems in the eighth grade, the mother was considering schools as far south as Baldwin and Mobile counties; no one testified that the mother and her current husband had visited those schools.
[4] The father did testify that the child had told him consistently that he wanted to reside with the father. The record also implies that the child had indicated to the mother that he wanted to reside with the father. However, the record contains no evidence indicating that the child had told "anyone who would listen" that he wanted to live with the father.
[5] The trial court also stated that,

"[d]espite her insistence that in order for [the child] to reside with [the] father he must have a trial period, the [mother] did not have a trial period three years ago when she married her new husband and moved [the child] into the same room with. . . her new husband's son, of whom he had custody."
The record contains no evidence to support that finding.
[6] In fact, if anything, the judgment implies that the trial court considered the child's wishes and his academic needs to be the foremost considerations for its transfer of custody. The trial court stated at the conclusion of its findings of fact:

"This Court believes that [the child]'s forthright statement that he wishes to reside with his father, the superior educational opportunities which exist at Pelham High School, and the [father's] concern and desire to intervene and assist this child in rectifying deficiencies clearly indicate that the McLendon standard has been met."
[7] The mother does not raise any issue regarding the propriety of that procedure, but our caselaw makes it patently clear that a trial court may not transfer custody to a parent on a "trial basis." See Barber v. Moore, 897 So.2d 1150, 1155 (Ala.Civ.App.2004) ("The supreme court's holding in Ex parte McLendon does not allow a trial court to modify custody on a trial basis or, as the mother argues occurred in this case, allow the trial court to experiment with an award of custody.").